

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-12-2000

# Brian B. v. Comm of PA Education

Precedential or Non-Precedential:

Docket 99-1576

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Brian B. v. Comm of PA Education" (2000). *2000 Decisions.* Paper 216.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/216

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 12, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 99-1576

BRIAN B., by and through his mother, LOIS B.;
ABDUL R., by and through his mother, DENA R.;
BYRON A., by and through his mother, CARRIE W.;
RONELLE W., by and through his mother, PAMELA J.;
STEVEN S., by and through his guardian, NANCY F.;
ANTHONY T., by and through his mother, CHRISTINE H.;
KENNETH R., by and through his mother, NANCY R.;
JEREMIAH M., by and through his mother, SUSAN M.;
on behalf of themselves and all others similarly situated

v.

COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF
EDUCATION; EUGENE W. HICKOK, in his official capacity
as Secretary of the Department of Education; GARNET
VALLEY SCHOOL DISTRICT; PHILADELPHIA SCHOOL
DISTRICT; CENTRAL YORK SCHOOL DISTRICT

        Brian B.; Abdul R.; Byron A.; Ronelle W.;
        Steven S.; Anthony T.; Kenneth R.; Jeremiah M.,
        Appellants

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 96-cv-07991)
District Judge: Honorable Louis H. Pollak

Argued March 2, 2000

BEFORE: ROTH, BARRY and STAPLETON, Circuit Jud ges

(Opinion Filed: October 12, 2000)

Marsha L. Levick (Argued)
Juvenile Law Center of Philadelphia
1315 Walnut Street, Fourth Floor
Philadelphia, PA 19107
 Attorney for Appellants

Michael L. Harvey (Argued)
Office of the Attorney General
 of Pennsylvania
Department of Justice
Strawberry Square
15th Floor
Harrisburg, PA 17120
 Attorney for Appellees

Theresa Glennon
Temple University
School of Law
1719 North Broad Street
Philadelphia, PA 19122
 Attorney for Amici Curiae
American Civil Liberties Union of
Pennsylvania; Center for Law and
Education; National Center for
Youth Law; Youth Law Center;
Children and Family Justice
Center of Northwestern University
School of Law; Professor Theresa
Glennon; and Professor Dean Hill
Rivkin

Thomas B. Schmidt, III
Pepper, Hamilton & Scheetz
P.O. Box 1181
Harrisburg, PA 17108-1181
 Attorney for Amici Curiae
American Probation and Parole
Association; Center for Children's
Policy, Practice and Research;
Center for Health, Achievement,
Neighborhood, Growth and Ethnic
Studies (Changes); Center for
Research and Evaluation in Social
Policy; The Center on Juvenile &
Criminal Justice; Citizens United
for the Rehabilitation of Errants
(Cure); Council of Juvenile
Correctional Administrators;
Criminal Justice Center, The
College of New Jersey; Dr. Barry
Krisberg, National Council on
Crime and Delinquency; National
Center on Institutions and
Alternatives; National Council on
Crime and Delinquency; National
Juvenile Detention Association;
National Legal Aid and Defender
Association; Pennsylvania Prison
Society; and The Sentencing
Project

OPINION OF THE COURT

STAPLETON, Circuit Judge:

Brian B. and a class of similarly situated school-aged youths ("Plaintiffs") appeal the District Court's denial of their motion for a preliminary injunction barring enforcement of a Pennsylvania statute on constitutional grounds. The statute, 24 Pa. Cons. Stat. S 13-1306.2(a) ("Subsection A"), limits the education available to youths convicted as adults and incarcerated in adult, county

3

correctional facilities. The Defendants are the Pennsylvania Department of Education ("DOE"), its secretary, and three local school districts.

The District Court had jurisdiction under 28 U.S.C. SS 1331 and 1343. We have appellate jurisdiction under 28 U.S.C. S 1292(a)(1).

I.

Pennsylvania law confers on youths between the ages of 6 and 21 the right to a public education until the completion of high school. See 24 Pa. Stat. Ann. tit. 13, S 1301. In accordance with this statutory mandate, juveniles who have been adjudicated delinquent and youths who have been convicted as adults and sentenced to state correctional institutions receive full education programs. Subsection A, however, provides that youths convicted as adults and sentenced to adult, county facilities are only entitled to the minimal education provided to expelled students:

> A person under twenty-one (21) years of age who is confined to an adult local correctional institution following conviction for a criminal offense who is otherwise eligible for educational services as provided under this act shall be eligible to receive educational services from the board of school directors in the same manner and to the same extent as a student who has been expelled. . . .

24 Pa. Cons. Stat. S 13-1306.2(a). County facilities are the only "local" ones.

An expelled student under age 17 has a right to only minimal educational services (about 5 hours per week versus the usual 27.5 hours), and an expelled student 17 or older is not entitled to education at all. See 22 Pa. Code S 12.6(e) (providing that expelled students under 17 are still entitled to education). As a result, Subsection A substantially limits, and for those 17 and over eliminates, the educational opportunities of youths convicted as adults and sentenced to adult, county correctional facilities. Although Subsection A treats these youths as if they were

4

expelled, there is no requirement that they be expelled or that their offenses be school-related.

Subsection A thus differentiates between school-aged youths convicted as adults based upon the locale of their incarceration: state inmates receive a full education, while county inmates receive limited education. A youthful offender's place of incarceration depends on the length of sentence and in certain cases the discretion of the sentencing judge. Those sentenced to two years or less are confined in county facilities. Those sentenced to five years or more go to state facilities. Sentences between two and five years can be served in either a county or state facility at the discretion of the sentencing judge. See 42 Pa. Const. Stat. S 9762.

Pre-trial detainees and special education students are the only exceptions from Subsection A. As a result of a settlement agreement prompted by this case, all school-aged youths confined as pre-trial detainees receive a full educational program, as do all school-aged youths who require special education because of a disability.

The District Court applied rational basis review under the Equal Protection Clause and concluded that the Plaintiffs had failed to show the reasonable probability of success on the merits necessary for a preliminary injunction. The Plaintiffs insist that because Subsection A burdens education, the statute warrants heightened scrutiny under Plyler v. Doe, 457 U.S. 202 (1982). Moreover, the Plaintiffs contend that even if Plyler's intermediate scrutiny does not apply, Subsection A also fails to pass constitutional muster under rational basis review.

A district court considering a motion for preliminary injunction must decide:

> (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably harmed by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.

5

Allegheny Energy, Inc. v. DQE, Inc., 171 F.3d 153, 158 (3d Cir. 1999) (citing ACLU v. Black Horse Pike Regional Bd. of Educ., 84 F.3d 1471, 1477 n.2 (3d Cir. 1996) (en banc)). "We review a district court's [disposition] of a preliminary injunction according to a three-part standard. Legal conclusions are reviewed de novo, findings of fact are reviewed for clear error, and the `ultimate decision to grant or deny the preliminary injunction' is reviewed for abuse of discretion." ACLU v. Reno, 217 F.3d 162, 2000 U.S. App. LEXIS 14419, at *27 (3d Cir. June 22, 2000) (quoting Maldonado v. Houstoun, 157 F.3d 179, 183 (3d Cir. 1998), cert. denied, 526 U.S. 1130 (1999)).

II.

We have held that the heightened scrutiny applied in Plyler v. Doe, 457 U.S. 202 (1982), is limited to "unique circumstances" that are absent here:

> In Plyler, the Supreme Court applied intermediate scrutiny to a statute that prohibited the disbursement of state funds for the education of the children of undocumented aliens. Plyler, however, expressly reaffirms the Court's holding in San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 35 (1973), that education is not a fundamental right and therefore that burdens on education are not subject to heightened scrutiny. It was the "unique circumstances" of a burden on education coupled with the disadvantaging of children of aliens that led to heightened scrutiny in Plyler, and the Court subsequently has expressly limited Plyler to those circumstances.

Philadelphia Police & Fire Assoc. for Handicapped Children, Inc. v. City of Philadelphia, 874 F.2d 156, 165 (3d Cir. 1989) (quoting Kadrmas v. Dickinson Public Schools, 487 U.S. 450, 459 (1988)).

The Supreme Court has declined to extend Plyler's heightened scrutiny to other education cases. In Kadrmas, the Court addressed "the constitutionality under the fourteenth amendment equal protection clause of a school bus service user fee. The Court rejected Kadrmas'

contention that those who could not afford the fee were denied equal access to education and that such a denial implicated heightened scrutiny." Philadelphia Police & Fire Assoc. for Handicapped Children, 874 F.2d at 165 n.5. Notably, Kadrmas distinguished Plyler on the ground that the children in Plyler were innocent victims of their parents' illegal immigration:

> We have not extended [Plyler] beyond the "unique circumstances" that provoked its unique confluence of theories and rationales. Nor do we think that the case before us today is governed by the holding in Plyler. Unlike the children in that case, Sarita Kadrmas has not been penalized by the government for illegal conduct by her parents.

Kadrmas, 487 U.S. at 459 (citations and internal quotation marks omitted).

The youth covered by Subsection A are being punished as a result of their own illegal conduct, not because of the illegal conduct of their parents. Accordingly, the heightened scrutiny applied in Plyler is inappropriate here. Lacking a basis for heightened scrutiny, we must apply the rational basis review ordinarily applied to social and economic legislation.

"[I]f a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relationship to some legitimate end." Romer v. Evans, 517 U.S. 620, 631 (1996). "In the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." Romer, 517 U.S. at 632. Indeed, under rational basis review, legislation enjoys a presumption of validity, and the plaintiff must negate every conceivable justification for the classification in order to prove that the classification is wholly irrational. See Federal Communications Comm'n v. Beach Communications, 508 U.S. 307, 314-15 (1993).

III.

The Defendants tender four justifications for the distinction Subsection A draws between county and state,

adult institutions: "1) space limitations in county correctional institutions; 2) higher per-student cost in county correctional institutions; 3) security concerns that would arise in state correctional institutions if education were discontinued; and 4) the greater need for education in state correctional institutions, independent of security concerns." Appellant's Br. App. 34-35.

First, the record indicates that 13 of the 73 adult, county correctional facilities in Pennsylvania do not have sufficient space to provide a complete educational program, and the legislature may have determined that requiring a full educational program in these institutions would require them to either preempt other services or to renovate at additional expense. Under rational basis review, a statute survives even if it is over-inclusive. Thus, if the legislature decides that space limitations in a fraction of the adult, county facilities justify the uniform limitation on education in adult, local facilities, that decision is not an irrational means of responding to the space concerns at some adult, local facilities.

Second, although some adult, county facilities have more school-aged inmates than state institutions, state facilities generally have higher youth populations. As the DOE Secretary puts it, "the legislature may have intended to reduce average per-pupil expenditures by not providing education to correctional facilities that house few convicted offenders, where per-pupil costs might well be higher." Appellant's Br. App. 38. While Plaintiffs perceive an inconsistency between this rationale and the decision to require school districts to pay for the education of all school-aged pre-trial detainees, all special education students, and all inmates in juvenile detention, we agree with the Defendants that a reasonable legislator might find these choices compatible. It is not irrational to require education regardless of location for pre-trial detainees because the guilt of these defendants has not been adjudicated and they thus could be seen as retaining Pennsylvania's general right to education. The legislature could also view education for special needs students as having a higher priority than education generally. Finally, the per-pupil cost in juvenile facilities may rationally be

8

perceived as lower because the entire population is of school age. In each case, the necessity of legislative line-drawing "renders the precise coordinates of the resulting legislative judgment virtually unreviewable, since the legislature must be allowed leeway to approach a perceived problem incrementally." Beach Communications , 508 U.S. at 316; see also Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 489 (1955) ("Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of onefield and apply a remedy there, neglecting the others.").

Third, the record indicates that before Subsection A was enacted, inmates in state correctional institutions received full educational services while school-aged county inmates did not. The Secretary suggests that curtailing education in state facilities would raise security concerns not similarly raised in county facilities. It is not irrational to believe that the discontinuation of an existing program is more likely to engender inmate hostility than the failure to institute one that inmates have never experienced. A perceived difference in security risks provides a rational basis for Section A's distinction between state and local institutions.

Fourth, the legislature could have determined that the longer term youth population found in the state correctional system would benefit more from educational services than the more transient population found in county jails. An offender's term in a county correctional institution could be less than a school year, a situation that could not occur for a school-aged youth incarcerated in a state correctional institution. While it may be true, as Plaintiffs insist, that even short breaks in education can render a youth less likely to complete his education, a legislature's non-arbitrary judgment about educational priorities is not subject to judicial second-guessing.

Thus, each of the justifications tendered by the

Defendants provides a rational basis for the distinctions drawn by Subsection A.1

IV.

Because the Plaintiffs have not shown a reasonable probability that the statute will be overturned, the District Court did not abuse its discretion in denying their motion for preliminary injunction. The District Court's order of June 17, 1999, will be affirmed.

_____

1. This fact distinguishes this case from Romer v. Evans, 517 U.S. 620 (1996), the Supreme Court's most recent case applying rational basis review and invalidating a statute on equal protection grounds. The Court there struck down a Colorado constitutional amendment barring the adoption -- and mandating the repeal -- of any state or local law specifically protecting homosexuals from discrimination. The Court explained that the amendment identified a classification of persons by a single trait and then disadvantaged that group "across the board" in all situations. Romer, 517 U.S. at 633. Because the amendment was "a status-based enactment divorced from any factual context," it was not possible to "discern a relationship to [any] legitimate state interests." Romer, 517 U.S. at 635. In contrast, juveniles convicted as adults and held in adult, county correctional facilities are not a group identified by
a single trait, and the burden imposed on them by Subsection A is limited to a specific educational context that, as we have shown, enables us to discern a rational connection with legitimate state interests.

ROTH, Circuit Judge, dissenting:

I agree with the majority that the proper standard of review for this case is rational basis scrutiny. I disagree, however, that Subsection A, which restricts the educational opportunities available to school-age county inmates, survives a rational basis review. In my view, Pennsylvania's treatment of this category of prisoners is arbitrary and violates equal protection. For that reason, I respectfully dissent.

I.

The Equal Protection Clause of the Fourteenth Amendment prohibits a State from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, S 1. Its central tenet requires that States treat like cases alike but may treat unlike cases differently. See Plyler v. Doe, 457 U.S. 202, 216 (1982). To determine whether a particular classification meets this obligation, courts examine, with varying levels of scrutiny, the relationship between the government's objective and the means to achieve it. Absent the singling out of a suspect class, such as race or gender, or the infringement of a fundamental right, courts apply the minimal level of scrutiny -- rational basis review.

The rational basis standard requires that a State express a rational relationship between the classification and some legitimate government interest. I recognize that this standard poses a nearly insurmountable hurdle to parties challenging a particular statute, requiring them to prove that there is no rational relationship, actual or hypothetical, between the stated end and the classification. See FCC v. Beach Communications, Inc., 508 U.S. 307, 315 (1993). Moreover, statutory classifications may be drawn so that "reform may take one step at a time," permitting the legislature to "select one phase of one field and apply a remedy there, neglecting others." Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 489 (1955).

In finding that Subsection A passes rational basis scrutiny, the majority relies almost exclusively on Lee Optical and Beach Communications, Inc., each of which

11

reviewed the scope of economic regulation. As the majority observes, legislation that does not target a suspect class or infringe a fundamental right enjoys a presumption of validity and federal courts ought to tread lightly when reviewing a statute under this standard. See Maj. Op. at 7. Yet the majority's analysis bends too far to accommodate this standard.

I am aware of what rational basis review precludes. Under Lee Optical and its progeny, a court cannot second-guess the legislature's wisdom or its policy judgment. A court would overstep its boundaries if it were to invalidate a law because it thought the law was bad for the community or because it believed that, in light of competing record evidence offering support for two options, the legislature made the wrong choice. See Beach Communications, Inc., 508 U.S. at 314 ("[J]udicial intervention is generally unwarranted no matter how unwisely [a court] may think a political branch has acted."). Nevertheless, making a legislative judgment "virtually unreviewable," id. at 316, does not make it nonjusticiable. Yet this is the practical effect of the majority's terse treatment of the Plaintiffs' plight.

There are limits to the deference owed to the legislature. As the Plaintiffs point out, the Supreme Court has applied rational basis scrutiny more circumspectly when legislation impinges on sensitive issues or controversial social policies. In such cases, the legislative classification must "find some footing in the realities of the subject addressed by the legislation." Heller v. Doe, 509 U.S. 312, 321 (1993) (upholding Kentucky law imposing different burdens of proof for civil and criminal involuntary commitment procedures). Moreover, the State may not "rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 446 (1985) (invalidating municipal ordinance requiring special use permit only for proposed group home for mentally retarded but not for other group homes). If the classification is motivated by invidious discrimination or if there is too flimsy a relationship between the means employed and the purported end, a court would be well within its authority to invalidate such a classification:

12

> The search for the link between classification and objective gives substance to the Equal Protection Clause; it provides guidance and discipline for the legislature, which is entitled to know what sorts of laws it can pass; and it marks the limits of our authority. . . . By requiring that the classification bear a rational relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law.

Romer v. Evans, 517 U.S. 620, 632-33 (1996) (invalidating Colorado ban on any official action designed to protect homosexuals from discrimination).

Subsection A's disparate treatment of school-age county inmates demonstrates a disconnect between the classification and its purported objective for several reasons. Most importantly, Pennsylvania law entitles individuals between 6 and 21 years of age to a free public education through high school. See 24 Pa. Stat. Ann. tit. 13, S 1301. Rights and benefits provided by a state law are subject to applicable constitutional constraint. See Goldberg v. Kelly, 397 U.S. 254, 262 (1970) (requiring due process before termination of individual's federal and state welfare benefits). Although a state is not obligated to provide its citizens benefits such as education, when it elects to do so, it may not deny that benefit to some citizens for arbitrary reasons. See Griffin v. Illinois , 351 U.S. 12 (1956) (invalidating state law that required purchase of transcript as precondition to appeal because no rational relationship between indigence and guilt). Moreover, while education is not a fundamental right, laws affecting education may be distinguished from other social legislation because of education's "importance . . . in maintaining our basic institutions, and the lasting impact of its deprivation on the life of the child." Plyler, 457 U.S. at 221. Thus, we ought not to allow education to be curtailed arbitrarily.

In addition, concern that an unpopular group is being singled out for discrimination is a cornerstone of equal protection analysis. See United States v. Carolene Products Co., 304 U.S. 144, 152-153 n. 4 (1938). While we do not consider prisoners a suspect class, they represent a group

13

to whom the legislature has limited political accountability. Yet political accountability is central to rational basis review:

> The Constitution presumes that . . . even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.

Vance v. Bradley, 440 U.S. 93, 97 (1979) (upholding mandatory retirement age of 60 for Foreign Service employees). Thus, while certainly not requiring a heightened level of scrutiny, even under rational basis review, limited political accountability obligates a court to "insist on knowing the relation between the classification adopted and the object to be attained." Romer , 517 U.S. at 632.

Finally, the interest the State promotes must be legitimate. Invidious discrimination –– whether motivated by antipathy or by a desire to harm a politically impotent group –– is an illegitimate aim. See Cleburne , 473 U.S. at 447. Sometimes, an improper motive is obvious. In Cleburne, it was the neighborhood's negative attitudes toward and fear of the mentally retarded. See id. at 448. In United States Dept. of Agriculture v. Moreno, 413 U.S. 528 (1973), it was Congress's ulterior motive to prevent "hippies" from participating in the food stamp program. See id. at 534. Unlike Cleburne and Moreno, here we have no "smoking gun" that proves antipathy toward county-incarcerated, school-age prisoners. The cursory explanations that Pennsylvania's DOE offers to justify Subsection A's classifications, however, especially in reference to an important benefit like education, suggest an apathy that borders on antipathy. As such, Subsection A's isolation of this particular group of school-age inmates awakens my skepticism.

II.

Applying these concepts of rational basis review to Subsection A, I find that the Pennsylvania DOE relies on inconsistent, piecemeal rationalizations to justify its

14

categorization that cordons off this single group of youth offenders. The application of Subsection A createsfive different categories of school-age inmates: county-incarcerated school-age inmates; state-incarcerated school-age inmates; pre-trial school-age detainees, wherever housed; school-age inmates requiring special education, wherever housed; and inmates of the juvenile detention system. Only county-incarcerated school-age inmates are treated as "expelled students." See 24 Pa. Cons. Stat. S 13-1306.2(a). I find that this categorization and the rationalizations offered for it lack "some footing in the realities of the subject addressed by the legislation." Heller, 509 U.S. at 321. A review of each of these classifications illustrates their arbitrariness.

The first classification is the distinction, on which the majority concentrates, between school-age convicts incarcerated in county facilities and those placed in state facilities. The Pennsylvania DOE offers four objectives to justify this distinction: (1) inadequate county facilities, (2) higher per-student costs to educate inmates confined to county facilities, (3) a comparatively greater need to educate state-incarcerated, school-age prisoners, and (4) security concerns in state facilities. I find that none of these justifications supports the denial to school-age county inmates of the educational benefits that their counterparts in state facilities receive.

With respect to the first justification, the Pennsylvania DOE does not argue that the county facilities have no space, only that it could be inconvenient for a few facilities to reschedule other programs or, in some instances, to accommodate the schooling of more school-age convicts. Obviously, however, these facilities have some space for educational use because classes are provided for pre-trial detainees and for special education students. Moreover, the space available must be flexible because the number of inmates presently eligible for schooling may fluctuate from day to day. There is no indication that the other school-age inmates in county facilities cannot be accommodated in that same space. Furthermore, when considering scheduling problems, the nature and impact of what is being scheduled cannot be ignored. I would hope that the

15

scheduling of space for educational programs would be given some priority.

While rational basis review may not require a State to prove its justifications, it does afford challengers the opportunity to rebut these justifications. See Beach Communications, Inc., 508 U.S. at 315. In my view, the Plaintiffs have rebutted the "inadequate space" justification.

As for the second reason, the higher per-student cost in county facilities, a closer look also reveals its irrationality. Were Pennsylvania DOE really concerned about lowering the average cost of inmate education, no county inmates would be educated. The DOE tries to articulate why it is willing to incur higher costs for some county inmates, but not for others. First, it argues that pre-trial detainees, as opposed to convicted school-age inmates, may be educated because they have yet to be proven guilty. Not only is that rationale unrelated to the purported per-student cost objective, but it suggests that convicted state inmates should also be denied education, something the Plaintiffs have not requested.[1] Second, the DOE argues that special education students are required by federal law,[2] not state law, to receive a free education. But an obligation, arising under a federal statute, does not justify the arbitrary elimination of the state's own obligation to provide education to one group of students and not to another. Moreover, it begs the question why state-incarcerated inmates, who do not have learning disabilities, should be educated. In fact, given that the Pennsylvania DOE is educating two categories of school-age county inmates, it is more likely to achieve economies of scale and lower per-student cost by educating all three categories of school-age

_____

1. Whether guilt is relevant to retaining educational benefits raises a different question: What is rational about imposing an additional punishment on an inmate solely based on where he is incarcerated? Because Plaintiffs have not suggested, however, that the denial of education is an ex post facto punishment, I merely pose this question rhetorically.

2. School-age individuals with special education needs are generally entitled to have their needs met through individualized educational programs at the state's expense under the Individuals with Disabilities Education Act. See 20 U.S.C. S 1400 et seq.

16

county inmates, rather than only the two. Moreover, technological developments, such as closed-circuit television, can facilitate the providing of educational programs at a lower per-student cost, whether one, two, or three categories of inmates are selected to receive those programs.

Fiscal integrity is a legitimate goal. States may not, however, achieve that goal by making invidious or arbitrary distinctions. See Zoebel v. Williams, 457 U.S. 55, 61-62 (1982) (invalidating Alaska dividend distribution program because it favored established over new state residents). By randomly demonstrating a willingness to assume education costs for some county prisoners but not for others, the Pennsylvania DOE's rationales become arbitrary, and thus impermissible.[3]

The third objective, the greater need to educate inmates in state facilities, fails too for the reasons Plaintiffs assert. First, the argument that the county inmate population is too transient is subverted by the Pennsylvania DOE's decision to educate an even more transient class-- pre-trial detainees. Second, the notion that state inmates are incarcerated longer and thus are less likely to return to their education after their release from confinement is belied by the Plaintiffs' data. See e.g., 11/25/97 Tr. at 5-12; 83-88; Stipulated Facts P 5, P 54,P 59 (describing harmful effects of break in education of even one year). Third, this rationale is undermined by the fact that it is the sentencing judge who determines whether school-age

_____

3. Plaintiffs also assert that the cost argument is a red herring because the school districts receive an allocation to cover educational costs for all
students residing in a particular district, including those incarcerated in
a county correctional facility. See Appellant's Br. at 46-49. See also 24 Pa. Cons. Stat. S 13-1306.2(c) which appears to bear out this assertion:

> (c) The department shall effectuate necessary procedures for the
> transfer of funds from the school district of residence to the
school
> district in which the local correctional institution is located. In
> effectuating the transfer of funds, the department may deduct the
> appropriate amount from the Basic Education Funding allocation of
> any school district which had resident students who were provided
> educational services in the local correctional facility.

17

inmates, convicted as adults and sentenced to between two and five years, will be confined in a state or county facility. Thus, there will be some inmates in county facilities who are serving the same sentence as state inmates but not receiving the same educational benefit -- and the only reason for the differential treatment is the discretion of the sentencing judge.4 Combined, these inconsistencies make this objective not only arbitrary but fallacious.

The fourth objective, concern for security in state facilities, is irrelevant in the context of this case. As the District Court concluded, whatever the merits of Pennsylvania's overall concern about the role education plays in promoting security in state facilities, the Plaintiffs are not requesting that we deny state inmates their educational benefits. See Brian B., et al. v. Commonwealth of Pennsylvania, 51 F. Supp. 2d 611, 633 (E.D. Pa. 1999).

In sum, the Pennsylvania DOE's purported objectives are undermined by its decision to deny the educational benefits to county-incarcerated, school-age inmates that it is willing to provide to pre-trial detainees and to special education inmates in the same facilities. The reasons for distinguishing this category of school-age inmates in the county facilities are so unrelated to the purported objectives of limited space and higher per-student cost that they can only be arbitrary. As a result, the broader distinction between state and county inmates cannot itself withstand the limited scrutiny that rational basis review applies. These flawed justifications bear as little rational relationship to the statutory classification at hand as the reasons offered by the City of Cleburne to justify its differential treatment of the mentally retarded. See Cleburne, 473 U.S. at 448-50.

Finally, Plaintiffs attack the two remaining classifications: expelled students and convicted juvenile delinquents. The link to expelled students -- apparently Pennsylvania's

_____

4. Under Pennsylvania law, felons sentenced to up to two years are housed in county facilities, those with sentences offive years or more are confined to state facilities, and those sentenced to between two and five years may be incarcerated in either facility at the sentencing judge's discretion. See 42 Pa. Cons. Stat. S 9762.

attempt to insulate Subsection A from challenge-- grants county-incarcerated, school-age inmates, under 17 years of age, the same minimal education benefits that expelled students receive.5 Yet, these two groups of school-age individuals are not similarly situated and thus should not be treated alike. A student is expelled from school when he violates school rules. As a consequence of his violation of school rules, an expelled student is denied a publicly funded education, a quid pro quo. He can still, however, obtain an education at his own expense. It is very unlikely, however, that the offense underlying the conviction of a county-incarcerated, school-age inmate was a violation of school rules. Moreover, county-incarcerated, school-age inmates cannot obtain an alternative education, privately funded or not, while in prison; and the reason for the denial of state-provided education is probably not related to the inmate's underlying offense. Thus, the relationship between expelled students and school-age county inmates is so attenuated as to render its linkage irrational.

Similarly, the distinction between confined juveniles and school-age county inmates lacks foundation. The District Court concluded that the juvenile justice system-- as a distinct penal system -- is primarily concerned with rehabilitation, so that providing its inmates an education furthers its primary objective. See Brian B., 51 F. Supp. 2d at 630 n.23. While sensible, this explanation does not go on to explain why state-incarcerated, school-age inmates convicted as adults receive education but county-incarcerated ones do not. For that reason, the explanation must fail.

None of the objectives the Pennsylvania DOE offers can justify its isolating this one group of school-age county inmates. I find that the Plaintiffs have done what rational

_____

5. Expelled students under 17 years of age must receive a minimum education benefit while those over 17 years of age lose their entitlement to any education. See Pa. Code S 12.6(e). The local school districts have discretion to decide what constitutes the minimal benefit. See Ambreski v. Southeastern Sch. Dist. Bd. of Directors, 421 A.2d 485, 488 (Pa. Commw. Ct. 1980). This minimum amount ranges from as little as 90 minutes a week to a maximum of 5 hours a week. See Brian B, et al., 51 F. Supp. 2d at 617-18.

basis review requires of them: They have demonstrated that there is no rational relationship between the statutory classification and the purported government objectives. See Beach Communications, Inc., 508 U.S. at 315 ("[T]hose attacking the rationality of the legislative classification have the burden `to negative every conceivable basis which might support it.' ") (quoting Lehnhausen v. Lake Shore Auto Parts, Co., 410 U.S. 356, 364 (1973)). As a result, I would hold that Subsection A denies this class of school-age county inmates equal protection of the law.

III.

The majority characterizes the Pennsylvania DOE's set of piecemeal justifications as falling within Lee Optical's "one step at a time" rubric, which permits a legislature to conclude that only part of a problem needs to be solved initially, and under which courts defer to the legislature's discretion to decide which part that is. See Maj. Op. at 8-9. But the seeming coherence of this incremental approach is illusory. As the analysis above demonstrates, the rationales for distinguishing among county inmates are unrelated to cost and space. Nor do Pennsylvania's other purported reasons, such as inmate guilt or student expulsion, suggest an alternative policy or evil to link these disparate categories that set county-incarcerated, school-age inmates apart.

Nevertheless, despite the absence of a "reasonably conceivable state of facts that could provide a rational basis" for the categories, see Heller, 509 U.S. at 320 (citing Beach Communications, Inc., 508 U.S. at 313), the majority upholds the classifications with no more than a perfunctory review. See Maj. Op. at 7-10. As I read the cases, even when applying rational basis scrutiny, our task of "adjudication is not a mechanical exercise nor does it compel `either/or' determinations." See Griffin, 351 U.S. at 26 (Frankfurter, J., concurring). Thus, while Lee Optical and Beach Communications, Inc., give states a wide berth to craft solutions to policy problems "one step at a time," they do not forbid our review of challenged social or economic legislation.

20

In conclusion, a state is not obligated by the federal Constitution to provide its citizens with a free public education. Once it decides to do so, however, it may not arbitrarily deny some of its citizen access to this benefit. In Pennsylvania's case, its hodgepodge of justifications for treating school-age county inmates differently than every other conceivable category of school-age prisoners, in adult or juvenile confinement, and treating them like expelled students, with whom they share no rational connection, amounts to just this type of prohibited arbitrary denial. As Justice Jackson once wisely observed, "we are much more likely to find arbitrariness in the regulation of the few than of the many." Railway Express Agency, 336 U.S. at 113. Pennsylvania's restriction of education to county-incarcerated, school-age inmates aptly proves this point.

I believe, therefore, that the Plaintiffs have shown a likelihood of success on the merits. Accordingly, I respectfully dissent and would remand this case to the District Court for it to determine whether the Plaintiffs have satisfied the other elements required for a preliminary injunction.6

A True Copy:
Teste:

     Clerk of the United States Court of Appeals
     for the Third Circuit
_____

6. Because the District Court concluded that the Plaintiffs were unlikely to prevail on the merits, it refrained from evaluating the other elements required for a preliminary injunction. See Brian B., 51 F. Supp. 2d at 635.

21