**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 21-2655 & 22-2027
_____

LACEY STRADFORD;
WILLIAM NETTLES;
JESSE STROUD;
WILLIAM SCOTT;
RICHARD RICHARDSON,
on behalf of THEMSELVES AND ALL OTHER
SIMILARLY SITUATED

v.

SECRETARY PENNSYLVANIA DEPARTMENT OF
CORRECTIONS,

Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-16-cv-02064)
District Judge: Honorable Juan R. Sanchez
_____

Argued: June 29, 2022

Before: JORDAN, PORTER, and PHIPPS,
*Circuit Judges*.

(Filed: November 9, 2022 )
_____

Sean A. Kirkpatrick
Office of Attorney General of Pennsylvania
Strawberry Square, 15th Floor
Harrisburg, PA 17120

Daniel B. Mullen **[Argued]**
Office of Attorney General of Pennsylvania
1251 Waterfront Place
Mezzanine Level
Pittsburgh, PA 15222

  *Counsel for Appellant*

Donald Driscoll **[Argued]**
Community Justice Project
100 Fifth Avenue
Suite 900
Pittsburgh, PA 15222

Alexandra Morgan-Kurtz
Pennsylvania Institutional Law Project
247 Fort Pitt Boulevard
4th Floor
Pittsburgh, PA 15222

  *Counsel for Appellees*

―――――――――

OPINION OF THE COURT

―――――――――

**PORTER**, *Circuit Judge*.

Class representatives Lacey Stradford, William Nettles, Jesse Stroud, William Scott, and Richard Richardson ("Appellees"), all convicted sex offenders, allege the Pennsylvania Department of Corrections ("DOC")[1] enforces a policy that unconstitutionally discriminates against sex offenders. The policy requires DOC to consider, among other things, "community sensitivity" when it evaluates parolees for halfway house placement. The District Court entered summary judgment for Appellees, holding that sex offenders and non-sex offenders are similarly situated and consideration of "community sensitivity" when making halfway house assignments is irrational.

But not all crimes are alike. The differences among sex crimes, and between sex crimes and non-sex crimes, preclude the purported similarity between sex offenders and non-sex offenders in this case. A discretionary grant of parole cannot erase those differences. In any event, DOC's halfway house policy considering "community sensitivity," among many other factors, is rationally related to more than one legitimate government interest. So we will reverse and remand for entry of summary judgment for the DOC.

―――――――――

[1] At the time of judgment, John Wetzel was the Secretary of Corrections. George Little took his place. *See* Fed. R. App. P. 43(c)(2) (providing automatic substitution of officeholders).

## I

After completing a minimum sentence, inmates in Pennsylvania are eligible to serve the rest of their sentence on parole. *See* 61 Pa. Cons. Stat. § 6137(a)(3). Parole is "a matter of grace and mercy shown to a prisoner who has demonstrated to the Parole Board's satisfaction his future ability to function as a law-abiding member of society upon release before the expiration of the prisoner's maximum sentence." *Hudson v. Pa. Bd. of Prob. & Parole*, 204 A.3d 392, 396 (Pa. 2019) (quoting *Rogers v. Pa. Bd. of Prob. & Parole*, 724 A.2d 319, 322–23 (Pa. 1999)).

The decision to grant parole is discretionary. 42 Pa. Cons. Stat. § 2154.5(b). Before deciding, the Parole Board must investigate, among other things, "[t]he general character and background of the inmate," "[t]he nature and circumstances of the offense committed," "[t]he written or personal statement of the testimony of the victim or the victim's family," the inmate's "behavioral condition and history," and his "complete criminal record." 61 Pa. Cons. Stat. § 6135(a).

When reviewing parole applications, the Parole Board must determine whether "[t]he best interests of the offender justify or require that the offender be paroled" and whether "the interests of the Commonwealth will be injured by the offender's parole." *Id.* § 6137(a)(1)(i)–(ii). In evaluating this standard, the Parole Board considers its own guidelines, which are designed to: (1) "[g]ive primary consideration to the protection of the public and to victim safety," (2) "[p]rovide for due consideration of victim input," (3) encourage proper conduct of parolees, (4) "encourage inmates and parolees to participate in programs that have been demonstrated to be

4

effective in reducing recidivism," (5) prioritize "incarceration, rehabilitation and other criminal justice resources for offenders posing the greatest risk to public safety," (6) "[u]se validated risk assessment tools," and "take into account available research relating to the risk of recidivism, minimizing the threat posed to public safety and factors maximizing the success of reentry." 42 Pa. Cons. Stat. § 2154.5(a).

The Parole Board also has authority to delay parole release until a satisfactory home plan is arranged and approved. *See* 37 Pa. Code § 63.1(d) ("The date of parole may be postponed until a satisfactory plan is arranged for the parolee and approved by the Board."); *Barge v. Pa. Bd. of Prob. & Parole*, 39 A.3d 530, 548 (Pa. Commw. Ct. 2012). Because finding housing is often difficult, most inmates first rely on halfway houses. Those houses have limited capacity. Public houses have only 700 spaces, and private contract facilities have 2,100 spaces statewide. But each year, about 9,000 Pennsylvania inmates are released on parole.

Sex offenders face several collateral consequences due to the nature of their criminal acts. They must participate in a specialized treatment program to become eligible for parole. Violent sex offenders must continue that specialized treatment program even after release from prison. Sex offenders must register with the Pennsylvania State Police. For violent sex offenders, the Pennsylvania State Police must notify the victim of their release. And relevant here, the Pennsylvania State Police must notify each resident, school district, day-care center, and college about nearby registered violent sex offenders. 42 Pa. Cons. Stat. §§ 9718.1, 9799.13, 9799.26, 9799.27, 9799.70.

According to DOC, that notification requirement makes it difficult to place sex offenders into community halfway houses because once neighbors are notified, some oppose sex offenders' presence. In at least one instance, community backlash against high concentrations of sex offenders in neighboring halfway houses caused a halfway house to close.

For the same reasons it is hard to place sex offenders into halfway houses, sex offenders once placed tend to linger in halfway houses longer than other parolees. Potential landlords can use an applicant's sex offender status to refuse leasing to them, and many sex offenders cannot obtain federally funded housing. *See* 42 U.S.C. § 13663(a); 24 C.F.R. § 5.856. As a result, paroled sex offenders often remain in halfway houses until their maximum sentences expire, and because sex offenders receive higher-than-average maximum sentences, it can take years for their sentences to expire once they are paroled. By contrast, according to DOC, other parolees spend ninety days on average in a halfway house. The cumulative effect of these phenomena is that sex offenders clog the parole system.

As originally drafted, DOC Policy 8.1.1 Section 4 designated sex offenders as categorically "hard to place" and rejected them for initial placement into halfway houses. J.A. 76. When the putative sex offender class challenged that policy in court, the District Court determined that, because non-sex offenders have a greater likelihood of successfully rejoining their communities after temporary placement in a halfway house, the DOC's policy served the legitimate interest in avoiding clogging the system. *Stradford v. Wetzel*, No. CV 16-2064, 2017 WL 1196656, at *4 (E.D. Pa. Mar. 31, 2017). The named plaintiffs appealed.

6

While on appeal, DOC changed its policy. The new policy lists thirteen factors DOC must consider before placing a parolee in a halfway house:

> a. community sensitivity to a criminal offense or specific criminal incident;
> b. board action stipulations;
> c. program needs vs. program availability in a particular area;
> d. separations from other reentrants or staff;
> e. multiple failures at one facility;
> f. victim consideration;
> g. medical or mental health needs;
> h. final discharge of maximum sentence date;
> i. gender status of the facility;
> j. pilots or studies being conducted;
> k. request by the reentrant for relocation;
> l. available community resources/support; and
> m. where the reentrant's committing county; requested release county; and home county are in relation to an appropriate center.

J.A. 83.

After the policy change, we vacated the District Court's judgment and remanded for it to consider whether the lawsuit was moot. *Stradford v. Sec'y Pa. Dep't of Corr.*, 783 F. App'x 150, 151 (3d Cir. 2019). Appellees filed an amended complaint challenging the new policy and the District Court found the suit not moot. *See Stradford v. Wetzel*, 519 F. Supp. 3d 214, 223 n.6 (E.D. Pa. 2021). The District Court said its former decision was in error. *Id.* at 230. It held that paroled sex offenders are similarly situated to other paroled offenders, and that there could be no rational basis to delay their placement into halfway

7

houses because of "community sensitivity." *Id*. at 224–25, 230–31.[2] This appeal followed.

## II

Appellees filed this class action under 42 U.S.C. § 1983. The District Court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. We have jurisdiction under 28 U.S.C. § 1291.

We review de novo the District Court's resolution of cross-motions for summary judgment. *Int'l Union, United Mine Workers of Am. v. Racho Trucking Co.*, 897 F.2d 1248, 1252 (3d Cir. 1990). Summary judgment is appropriate when, drawing all reasonable inferences in favor of the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact," and thus the movant "is entitled to judgment as a matter of law." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).

---

[2] The DOC says that there is an unresolved dispute of material fact over the degree of delay in halfway house placement caused by the community-sensitivity factor. While this is a factual dispute, it is not material because both parties agree that the community sensitivity factor disfavors sex offenders. In defense of the policy, DOC admits that community backlash makes sex offenders difficult to place. And DOC recognizes that "lack of community acceptance," Appellant's Opening Br. 12, prevents it from "[p]lacing too many sex offenders into halfway houses at a given moment," Appellant's Opening Br. 13. Without a genuine dispute of material fact, we will evaluate the equal-protection claim's merit.

8

## III

The Fourteenth Amendment's Equal Protection Clause states that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Supreme Court has said that "the equal protection of the laws is a pledge of the protection of equal laws." *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886). At bottom, the Equal Protection Clause requires equal treatment of "all persons similarly situated." *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 125 (3d Cir. 2018) (quoting *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005)). "The Equal Protection Clause does not forbid classifications." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). But the distinctions between classes "must be rationally related to a legitimate governmental purpose." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985).

To establish an equal-protection claim, a plaintiff "must show that the Government has treated it differently from a similarly situated party and that the Government's explanation for the differing treatment does not satisfy the relevant level of scrutiny." *Real Alternatives, Inc. v. Sec'y Dep't of Health & Hum. Servs.*, 867 F.3d 338, 348 (3d Cir. 2017) (emphasis removed) (citing *City of Cleburne*, 473 U.S. at 439–40).[3]

---

[3] The parties agree that the DOC's policy is subject to rational basis review because sex offenders do not belong to a suspect or quasi-suspect class and the DOC's policy implicates no fundamental constitutional rights. *See Artway v. Att'y Gen. of N.J.*, 81 F.3d 1235, 1267 (3d Cir. 1996).

A

Because "equality" is a rhetorically ambiguous concept, it's easy to "invoke any existing descriptive inequality as a basis for asserting what is essentially a prescriptive grievance." Peter Westen, *Speaking of Equality: An Analysis of the Rhetorical Force of "Equality" in Moral and Legal Discourse* 279 (1990). But the Fourteenth Amendment proscribes unequal treatment only among persons similarly situated according to a relevant standard of comparison. *See Nordlinger*, 505 U.S. at 10 (Persons are similarly situated under the Equal Protection Clause when they are alike "in all relevant respects."). So an equal-protection challenge must allege more than "broad generalities" in identifying a comparator. *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1204 (11th Cir. 2007). Courts must "isolate the factor allegedly subject to impermissible discrimination." *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996) (quoting *United States v. Aguilar*, 883 F.2d 662, 706 (9th Cir. 1989)); *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 504–05 (7th Cir. 2014) (same); *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995) (same). Other factors explaining disparate treatment will usually preclude persons from being similarly situated. In turn, the failure to identify similarly situated persons dooms an equal-protection claim. *See Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006) (citing *Levenstein v. Salafsky*, 414 F.3d 767, 776 (7th Cir. 2005)) (stating equal-protection claim "must fail because [plaintiff] does not allege the existence of similarly situated individuals").

Pennsylvania law creates three tiers of sex offenders based on their offenses and further distinguishes sexually violent predators. *See* 42 Pa. Cons. Stat. §§ 9799.14, 9799.24.

DOC incorporates those distinctions into its decisions on when and where to place sex offender parolees. Appellees must show that these are irrational distinctions for those decisions.

When evaluating whether offenders are similarly situated under the Equal Protection Clause, we must assess the nature of their respective crimes. *See Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942) (determining whether embezzlement and grand larceny are "intrinsically the same quality of offense"); *Doe v. Settle*, 24 F.4th 932, 940 (4th Cir. 2022) ("When a law imposes collateral consequences based on criminal convictions, two impacted offenders who are treated differently can be similarly situated if their convictions are similar enough."). So Appellees need to show, for example, that an offender convicted of rape and an offender convicted of robbery, wire fraud, or a drug offense "are alike 'in all relevant respects.'" *Harvard v. Cesnalis*, 973 F.3d 190, 205 (3d Cir. 2020) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).

Because Appellees assert that all sex offenders are similarly situated to all other offenders eligible for parole, they need to do this comparison for each crime of conviction. They must also show that sex offenders are similarly situated among themselves. Differences between crimes might reasonably explain differences in treatment. So Appellees must evaluate each crime to see if they are, in essence, the same quality of offense.

Appellees have not made these comparisons. But courts that have done so conclude, unsurprisingly, that sex crimes and non-sex crimes—and even different types of sex crimes—are dissimilar. *See, e.g.*, *Petitpas v. Martin*, No. 20-3557, 2021 WL 6101469, at *2 (2d Cir. Dec. 22, 2021) (collecting cases); *Carney v. Okla. Dep't of Pub. Safety*, 875 F.3d 1347, 1353–54

(10th Cir. 2017) (aggravated sex offenders are not similarly situated to ordinary sex offenders); *Litmon v. Harris,* 768 F.3d 1237, 1243 (9th Cir. 2014) (mentally disordered offenders and mentally disordered sex offenders are not similarly situated to sexually violent predators).

These essential differences between crimes also explain why laws imposing collateral burdens on sex offenders have generally been upheld. *See, e.g.*, *United States v. Kebodeaux*, 570 U.S. 387, 395–96 (2013) (explaining why differences between sex offenders and non-sex offenders justify post-release registration rules); *Smith v. Doe*, 538 U.S. 84, 103–04 (2003) (upholding reporting requirements for sex offenders); *Conn. Dept. of Pub. Safety v. Doe*, 538 U.S. 1, 4 (2003) (upholding publicly available sex offender registry).

"Sex offenders are a serious threat in this Nation." *McKune v. Lile*, 536 U.S. 24, 32 (2002) (plurality opinion). "[T]he victims of sexual assault are most often juveniles," *id.*, and "[t]he sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002). Precisely because sex offenses are serious and different than other types of crimes, Pennsylvania law imposes unique collateral consequences on sex offenders. Sex offenders must register with the state police, may not qualify for federally funded public housing, and must participate in a sex offender treatment program.[4] And the state police must notify each

---

[4] *See* 42 Pa. Cons. Stat. § 9799.13 (requiring registration with the state police); 34 U.S.C. § 20920 (requiring states put offender information on a publicly accessible website); 42 U.S.C. § 13663(a) (prohibiting those who are subject to a lifetime registration requirement from public housing); 42 Pa.

resident, school district, day-care center, and college about nearby registered sex offenders. *See* 42 Pa. Cons. Stat. § 9799.27. Those collateral consequences are linked to Pennsylvania's finding that "[s]exual offenders pose a high risk of committing additional sexual offenses and [that] protection of the public from this type of offender is a paramount governmental interest." 42 Pa. Cons. Stat. § 9799.11(a)(4).

Because of these policies, sex offenders have a harder time finding a job or a home. The notification policy also means that residents are aware of the presence of sex offenders (unlike other offenders) in their neighborhood. These are inescapable facts for policymakers at DOC trying to make rational halfway house policies.

Appellees argue that a favorable parole action eliminates the differences between offenders because the Parole Board considers them all safe to release into the public. *See* Appellees' Br. 17–18. The District Court adopted that theory. *Wetzel*, 519 F. Supp. 3d at 224–25. We disagree. The individualized assessment underlying a favorable parole action doesn't expunge one's legal status as a sex offender, or change him from a sex offender to a non-sex offender. And the parole inquiry of "whether an individual poses a substantial danger of physical harm to others is far broader than the inquiry into whether one is likely [to] . . . engage in sexually violent criminal behavior." *Litmon*, 768 F.3d at 1243 (internal quotation marks omitted). So a favorable parole action does not

Cons. Stat. § 9718.1 (requiring participation in treatment program); 42 Pa. Cons. Stat. § 9799.70 (mandating a continued treatment program for violent sex offenders).

13

alleviate the differences between sex crimes and non-sex crimes.

A parole board's individualized assessment is merely a reasoned "prediction[] of future behavior" about a particular individual, so by itself it cannot make two people, let alone entire groups of offenders, similarly situated. *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981). As in other states, the decision to parole in Pennsylvania is discretionary. *See* 42 Pa. Cons. Stat. § 2154.5(b). The Parole Board uses a general and flexible standard when deciding to grant parole. *See* 61 Pa. Cons. Stat. § 6137(a)(1)(i)–(ii). When applying this standard, the Parole Board considers numerous subjective criteria. *See* 42 Pa. Cons. Stat. § 2154.5(a). And to aid in its decision, it must investigate, among other things, the various attributes of the inmate and the facts of his crime. *See* 61 Pa. Cons. Stat. § 6135(a).

Despite its best efforts, the Parole Board can't predict any offender's future conduct. The Parole Board's discretionary, predictive, and fallible determination is based on individualized evaluation and imperfect knowledge. That is legally relevant because state action that involves "discretionary decisionmaking based on a vast array of subjective, individualized assessments" necessarily results in different treatment among those subject to the discretionary action. *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 603–04 (2008) (different but discretionary treatment of apparently similarly situated employees does not raise equal protection concerns).

The Equal Protection Clause allows state officials to exercise their discretion to grant parole to "one class of criminals and deny it to others," to determine "the kind or

14

amount of evidence upon which to base its determination," or attach whatever "conditions to the application for or to the granting of [parole] as [the state] may deem proper." *Ughbanks v. Armstrong*, 208 U.S. 481, 488 (1908).[5] The government "is not bound to grant a parole in any case" so long as it treats similarly situated persons equally. *Id*. at 487.

The District Court held that considering the collateral consequences of sex offenses was irrelevant because they "are part of the very classification on the basis of which Plaintiffs argue they are suffering discrimination." *Wetzel*, 519 F. Supp. 3d at 225. That is, the District Court agreed with Appellees that DOC couched an equal protection violation within another, antecedent equal protection violation. But these collateral burdens have themselves survived Equal Protection Clause scrutiny. *See, e.g.*, *Artway*, 81 F.3d at 1267–68. And in any event, Appellees' counsel acknowledged in oral argument that state and federal laws imposing collateral burdens on sex offenders are reasonable attempts to protect the public and disclaimed the suggestion that they, too, are unconstitutional.

Appellees are not similarly situated with non-sex offender parolees, so the first prong of their equal protection claim fails. *Hill*, 455 F.3d at 239. But even if Appellees could show that they are similarly situated to non-sex offender parolees, that would not save their claim. Because Appellees

---

[5] Of course, Pennsylvania may not classify offenders based on factors that are "foreign to the parole statute," such as race, religion, or political beliefs. *Newman v. Beard*, 617 F.3d 775, 784 (3d Cir. 2010). But none of these impermissible factors are at issue here.

don't belong to a suspect class, they would have to show that DOC's halfway house policy is irrational.

B

Under the rational basis test, a law does not "run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Armour v. City of Indianapolis*, 566 U.S. 673, 680 (2012) (quoting *Heller v. Doe*, 509 U.S. 312, 319–20 (1993)). The challenged "legislation enjoys a presumption of validity, and [a] plaintiff must negate every conceivable justification for the classification in order to prove that the classification is wholly irrational." *Brian B. ex rel. Lois B. v. Pa. Dep't of Educ.*, 230 F.3d 582, 586 (3d Cir. 2000). "[I]f there is any reasonably conceivable state of facts that could provide a rational basis for the classification," the policy survives. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). And if DOC's conceivable rationale seems tenuously related to its governmental interest, the sex offenders still must show that its criteria and actions are "wholly irrational." *Cabrera v. Att'y Gen. U.S.*, 921 F.3d 401, 404 (3d Cir. 2019) (citation omitted).

DOC's halfway house policy is supported by rational bases. Pennsylvania has a legitimate interest in considering public safety and public concern over the concentration of sexual offenders in a given area. Specifically, DOC has a legitimate interest in considering a community's rational concern about sex offenders' troubling crimes and risk of recidivism.

Communities rationally fear that sex offenders pose a serious "danger to the community" because they typically have

16

a "higher risk of recidivism." *United States v. Juv. Male*, 670 F.3d 999, 1010 (9th Cir. 2012) (quoting *United States v. Salerno*, 481 U.S. 739, 747 (1987)); *Litmon*, 768 F.3d at 1244; *see also Doe v. Moore*, 410 F.3d 1337, 1347 (11th Cir. 2005) ("The increased reporting requirements based on evidence of increased recidivism among [sex offenders] . . . [are] rationally related to the state's interest in protecting its citizens from criminal activity."); *Cutshall v. Sundquist*, 193 F.3d 466, 483 (6th Cir. 1999) ("Given the indications that sex offenders pose a particular threat of reoffending, we cannot say that the Act is irrational [under the Equal Protection Clause].").

These fears are not based on mere animus or unfounded prejudice. "Half of prisoners released after serving time for rape or sexual assault had an arrest within 9 years that led to a conviction." U.S. Department of Justice, Bureau of Justice Statistics, *Recidivism of Sex Offenders Released from State Prison: A 9-Year Follow-Up (2005-2014)* 6 (2019) (https://bjs.ojp.gov/library/publications/recidivism-sex-offenders-released-state-prison-9-year-follow-2005-14, last visited September 14, 2022). And the Justice Department recently confirmed its prior findings that sex offenders released from state prison are much more likely than other released prisoners to be arrested for rape or sexual assault. *Id.* at 5. *See McKune*, 536 U.S. at 32 (citing 1997 and 2000 studies).

But even if sex offenders recidivate at equal or lower rates than other criminals, a community can rationally fear sex offenders more than other criminals because sex offenders target "vulnerable individuals." *Artway*, 81 F.3d at 1267 ("Protecting vulnerable individuals from sexual offenses is certainly a legitimate state interest."); *see also Doe v. Cuomo*, 755 F.3d 105, 115 (2d Cir. 2014) (requiring a sex offender

17

considered non-dangerous to remain on a sex offender registry rationally relates to protecting the public).

Appellees contend that any consideration of community sensitivity impermissibly opens the door to irrational prejudice held unconstitutional by *City of Cleburne*, 473 U.S. 432. That argument conflates "mere negative attitudes, or fear, [toward the mentally retarded] unsubstantiated by factors which are properly cognizable in a zoning proceeding" with one of thirteen factors cumulatively considered by the Parole Board before designating prisoners for discretionary placement in a halfway house. *Id.* at 448. In *City of Cleburne*, the city council denied a special use permit for a group home for the intellectually disabled. To support its decision, the council pointed to "the negative attitude of the majority of property owners located within 200 feet" of the proposed location. *Id.* But those concerns are not "properly cognizable in a zoning proceeding." *Id.* The council needed a different reason to justify denying the permit.

The Court in *Cleburne* emphasized that only "*irrational* prejudice" is unlawful under the Fourteenth Amendment. *Id*. at 450 (emphasis added); *see also U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534–35 (1973) (holding that nothing more than "a bare congressional desire to harm a politically unpopular group" violates the Equal Protection Clause); *Romer v. Evans*, 517 U.S. 620, 632 (1996) (holding unlawful a state law that precluded local ordinances from protecting homosexuals from discrimination because it "seems inexplicable by anything but animus toward the class it affects"). In other words, disfavor based on nothing but mere animus toward a group violates the Equal Protection Clause. Here, DOC relied on thirteen factors to evaluate a parolee's fitness for placement in a halfway

18

house, and those factors are related to the success of the halfway house system.

Appellees argue that by virtue of the Parole Board's favorable decision, sex offenders granted parole do not have the same likelihood of recidivism as sex offenders denied parole. This argument relies on two faulty premises. In its strongest form, the argument presumes that a favorable parole decision somehow eliminates or reduces the offender's actual likelihood of recidivism. In its weaker form, the argument presumes that a decision to grant parole is a definitive finding of offenders' low risk to the public. But any parole decision is an exercise of discretion considering, among many other things, the Parole Board's best assessment of an offender's risk of recidivism. The Parole Board doesn't purport to predict the future, and it certainly can't determine the offender's actual likelihood of recidivism. The agency's discretionary, predictive decision doesn't render irrational community concerns about sex offender recidivism or the State's legitimate interest in protecting vulnerable people.

For administrative and efficiency reasons, DOC also has a rational interest in considering community concern over high concentrations of sex offenders. *See Califano v. Jobst*, 434 U.S. 47, 53 (1977) (administrative efficiency of Social Security program is a legitimate government interest satisfying rational basis test). According to DOC, space in halfway houses is limited. There are more parolees than rooms available in halfway houses. Thus, halfway houses cannot accommodate every parolee, especially not for long periods. The nettlesome issue with sex offenders, according to DOC, is that they tend to stay longer in halfway houses and end up clogging the halfway house system. DOC says this is

attributable to the collateral burdens that sex offenders uniquely face.

Because of those challenges, the population of sex offenders in halfway houses tends to increase over time. Such concentration, combined with sex offenders' propensity to recidivate, arguably creates an increased risk of sex crimes in an area. Because of similar concerns, Pennsylvania law limits the number of sexually violent predators in group homes, including halfway houses. *See* 42 Pa. Cons. Stat. § 9799.55(d)(1). The community is rationally sensitive to sex offender concentration, and DOC's policy of considering community sensitivity for halfway house placement rationally relates to its interest in maximizing halfway house availability for all offenders.

Appellees argue that most, but not all, offenders were successfully placed in homes after their stays in halfway houses, that most sex offenders left halfway houses before their sentences expired, that at least one halfway house's occupants consist of forty percent sex offenders without controversy, and that DOC officials did not produce evidence showing that sex offenders commit sex offenses during their stays at halfway houses. But this evidence doesn't negate every conceivable justification offered by DOC or show that its halfway house policy is utterly irrational. "[T]he Constitution does not require the [DOC] to draw the perfect line nor even to draw a line superior to some other line it might have drawn. It requires only that the line actually drawn be a rational line." *Armour*, 566 U.S. at 685. Nor does rational basis review require specific facts to justify the government's legitimate purpose; all it asks is whether a policy is rational based on "any reasonably conceivable state of facts." *Beach Commc'ns*, 508 U.S. at 313.

Even "rational speculation unsupported by evidence or empirical data" is enough. *Id.* at 315. DOC's halfway house policy satisfies that low bar.

Finally, we note that the entire criminal law system reflects the community's moral judgments. *See United States v. Bass*, 404 U.S. 336, 348 (1971) ("[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity."). Criminal and penal laws graduate punishment to account for the severity of the crime and the defendant's moral culpability. *See, e.g.*, *Wimberly v. Williams*, 14 F.4th 1140, 1148–49 (10th Cir. 2021) (state had rational basis to treat sex offenders differently because they "have been convicted of crimes considered particularly heinous"). There is no reason to depart from this principle for parole proceedings. The public's moral judgments about sex offenses are no less legitimate in post-conviction matters, particularly where offenders are still serving their term of punishment. *See Commonwealth v. Williams*, 692 A.2d 1031, 1035 (Pa. 1997) (citing *Griffin v. Wisconsin*, 483 U.S. 868, 873–75 (1987)) ("parole is a form of criminal punishment imposed after a guilty verdict").

\*      \*      \*

Because the District Court erred in granting summary judgment for Appellees, we will reverse and remand for entry of summary judgment for the Department of Corrections. In light of our disposition, the appeal of the District Court's April 29, 2022 order will be dismissed as moot.