39 A.3d 530 (2012)
Samuel BARGE, Timothy Helsel, Peter Rackley, Joseph Hartdegen, Juan Lopez, Clyde Phillips, and Gregory Moore, Petitioners
v.
PENNSYLVANIA BOARD OF PROBATION AND PAROLE, Catherine C. McVey, Chairman, Pennsylvania Department of Corrections, and John E. Wetzel, Secretary, Respondents.
No. 149 M.D. 2011
Commonwealth Court of Pennsylvania.
Submitted on Briefs October 21, 2011.
Decided February 2, 2012.
*533 Donald Driscoll and Marybeth Walsh, Pittsburgh, for petitioners.
Chad L. Allensworth, Assistant Counsel, Harrisburgh, Travis S. Anderson, Assistant Counsel and Debra Sue Rand, Assistant Counsel, Mechanicsburg, for respondents.
BEFORE: McGINLEY, Judge, and SIMPSON, Judge, and FRIEDMAN, Senior Judge.
OPINION BY Judge SIMPSON.
Petitioners, who are current or former state correctional inmates[1] accused or convicted of sex offenses, and who were granted parole, but were denied release to community corrections centers (CCCs), filed suit in our original jurisdiction. Petitioners challenge the policies and practices of the Pennsylvania Board of Probation and Parole (Board) and the Department of Corrections (DOC) in the parole release process. They seek mandamus and injunctive relief.[2] DOC and the Board filed *534 preliminary objections, challenging, among other things, the legal sufficiency of the complaint. Also before the Court at this time is Petitioners' motion for summary relief.
For the reasons that follow, we sustain DOC's preliminary objections and, therefore, we dismiss Petitioners' claims against DOC. Additionally, we sustain in part, and overrule in part, the Board's preliminary objections. Finally, we deny Petitioners' motion for summary relief.

I. Petition for Review

A. Overview of Petitioners' Claims
In their 154-paragraph petition for review, Petitioners begin with an "overview" of their claims, which we summarize as follows. Petitioners are Pennsylvania state correctional institution inmates who were granted parole, but who were denied release from prison on parole. This denial of parole release is pursuant to policies and practices of DOC and the Board, which are allegedly contrary to the duties imposed by Pennsylvania law, as well as the requirements of the United States and Pennsylvania Constitutions. These policies and practices include the denial of transitional community housing, including CCCs, also known as "half-way houses," operated by DOC, to individuals who committed a sex offenses. Pet. for Review at ¶ 4. These policies and practices also include the Board's failure to establish, by regulation, evidence-based and uniform standards for approval of ongoing residency, known as home plans, and to implement these standards in a manner that ensures the timely and efficient release of individuals granted parole who meet these standards.

B. Factual Background
Petitioners aver the following facts. Each Petitioner has at some point in the past committed or been accused of a sex offense. The Board granted each Petitioner parole "following a determination that, subject to compliance with specific conditions, each [Petitioner] does not at this time present a reasonable risk of harm to the community." Pet. for Review at ¶ 7.
Petitioners further aver DOC has issued reports finding sex offenders present a significantly lower rate of recidivism than any other category of offender. Petitioners aver DOC's Office of Planning, Research, Statistics and Grants prepared these reports, and both reports are currently available at www.cor.state.pa.us. See Pet. for Review, Ex. 1 at 7, 13 (entitled, "A REVIEW OF EVIDENCE BASED PRACTICE IN THE ASSESSMENT & TREATMENT OF SEX OFFENDERS" December 2005); Ex. 2 at 8 (entitled, "Recidivism in Pennsylvania State Correctional Institutions 1999-2004" December 2006).
Petitioners also aver the vast majority of paroled sex offenders recommitted to prison are technical parole violators rather than convicted parole violators. See Pet. for Review, Ex. 1 at 6. Further, when a paroled sex offender commits a new criminal offense, it is less likely to be a sex offense.
Petitioners allege DOC has also found that sex offenders elicit a great degree of public fear and apprehension as well as abhorrence. Id. at 4. Additionally, they aver, although the overall crime rates of sex offenders decreased, during at least one recent year (2004) more sex offenders were admitted to Pennsylvania prisons than were discharged. Id. at 3, 6.
*535 Petitioners further allege sex offender treatment is available to all CCC residents on an outpatient basis. See Pet. for Review, Ex. 3 at 2 (DOC publication entitled, "Community Corrections" April 2004); Ex. 4 at 31 (DOC publication entitled, "A Handbook for the Families and Friends of Pennsylvania Department of Corrections Prison Inmates" November 2006) (currently available at DOC's website).

C. Parole to CCCs
For a number of years, the Board relied on CCCs as acceptable placements for those parolees whose release was conditioned on initial transitional or halfway house occupancy. There are approximately 38 CCCs operated by private contractors who respond to requests for proposals from DOC and approximately 14 CCCs run directly by DOC that are geographically distributed throughout Pennsylvania.
Petitioners aver the Board recently reported "the cost of supervising a parolee for one year is $3,095 versus $32,059 for a year of incarceration in a state correctional institution." See Pet. for Review, Ex. 6 at 3 (January 2011 Board report entitled "Pennsylvania's Reentry System, Toward Safer Communities") (available at www. pbpp.state.pa.us).
Petitioners allege DOC has permitted, if not required, contracted CCCs to categorically reject all sex offenders, and all or most have done so. Most state-run CCCs also categorically reject all sex offenders. This rejection of sex offenders from CCC placement is without regard to whether the offender (1) has a home plan previously approved by the Board; (2) can show a likelihood of identifying an approved home plan during the CCC program period; (3) has access to independent services to assist with housing and employment; and, (4) requires income through employment before being able to secure ongoing housing. Petitioners further aver DOC does not consider the nature of their underlying sex offense, including whether it involved an adult victim, and whether it required registration under the statute colloquially known as Megan's Law. 42 Pa.C.S. §§ 9791-9799.9.[3]
Petitioners allege the virtual absence of CCC beds for conditionally paroled sex offenders has been largely, if not entirely, based on community opposition. Numerous municipalities have adopted residency restriction ordinances which provide that those sex offenders who must register under Megan's Law are not permitted to reside within designated distances from where children may congregate.
Petitioners allege DOC honors these local residency restriction ordinances and the exclusion of sex offenders by both contracted and state-run CCCs is at least, in some instances, the result of such ordinances. In the few instances that a CCC accepts sex offenders, it severely limited the number of placements or beds assigned to sex offenders. CCCs have not so restricted any other category of paroled offender. These limitations result in an insufficient number of CCC placements available for paroled inmates whose release is dependent on initial CCC occupancy.
Petitioners further allege that in granting parole, the Board often bases its decisions *536 on an offender's motivation for success and completion of institutional programs, including employment skills training. A principal purpose of CCC occupancy is to facilitate the achievement of a statutory objective of parole, which is to provide parolees the opportunity to become useful members of society. See Section 6102(1) of the statute commonly known as the Parole Act, 61 Pa.C.S. § 6102(1). Those who spend extended periods in prison typically require access to the community through CCC occupancy to secure ongoing housing and employment. CCC occupancy usually extends for three to six months. Those paroled to CCCs are typically able to demonstrate the ability to obtain an approved home plan prior to release from the CCC, when given the opportunity.
Many social service providers including, but not limited to, Catholic Social Services, Community Shelter Services and the Salvation Army are available to assist parolees with housing and employment while they are in a CCC, but not while they are still in prison. Offenders who are granted parole with the condition that they initially occupy a CCC are also required by the Board to obtain an approved home plan before their release from the CCC. Upon the grant of parole, these offenders are referred by institutional parole staff to DOC for CCC placement. However, DOC rejects all sex offenders for CCC placement if they do not have an approved home plan prior to the referral for CCC placement.
Due to the additional parole release condition imposed by DOC upon sex offenders, that they have an approved home plan prior to a referral for CCC placement, these offenders are denied parole release and, in effect, parole. Despite informing paroled sex offenders that CCC rejection is due to not having an approved home plan, DOC, nevertheless, rejects sex offenders referred for CCC placement even when they have been able to and do obtain an approved home plan prior to the referral. When doing so, DOC states that it views the placement to be "problematic" or specifically due to the circumstances of their offense, even though these circumstances were fully considered by the Board when granting parole. Pet. for Review at ¶ 41.
When DOC rejects paroled sex offenders for CCC placement, it recommends resubmission of referrals for such placement six months prior to the date these offenders reach their maximum sentences. Even then this routinely does not occur.
Petitioners further allege that the Board is aware there are virtually no CCC placements available for the hundreds of sex offenders who are granted parole based on DOC's policies and practices; however, it has not contracted to supplement halfway house services in order to assist these parolees.

D. Parole Supervision Through Home Plan Approval
Petitioners next allege the Board established uniform, written standards that apply to home plan applications of sex offenders whose victims were minors. Specifically, the Board determined such plans will be rejected if a proposed home is within 1,000 feet of a school, day care facility or playground. Nevertheless, home plans are also rejected if the proposed residence is within a much greater distance of a school, day care facility or playground. Additionally, the Board rejects home plans that are within 1,000 feet of a school bus stop or a church, or if there is a family with a child living nearby. Such standards have not been reviewed to determine if they are evidence-based.
*537 Petitioners further aver the Board does not permit approval of a home plan if it does not comply with a local sex offender residency restriction ordinance. Also, it is not unusual for the same property to be approved for a paroled sex offender by one parole agent and disapproved for the same offender by another agent. Some parole agents permit approval of homes anywhere in the state, while others refuse to consider a home that is not within an offender's original home county even when no ties to that county remain after years of imprisonment.
Applications for home plan approvals are routinely denied with no reason given or simply receive no response from the Board. There is no process available to obtain administrative review when a decision is issued without a reason, is not issued, or is issued for a reason inconsistent with uniform written standards.

E. Individual Petitioner Facts
Petitioners then set forth (in more than 90 paragraphs) the specific facts applicable to each named-Petitioner, as well as several other inmates who are not named as Petitioners. They aver these individuals were granted parole, but were not actually released on parole to CCCs or given home plan approval. Petitioners assert the facts averred show the Board's denial of their home plan applications lack uniformity. They further aver the reasons provided by the Board are based on varying standards and factors that are inconsistent with published guidelines and do not take into account the specific nature of Petitioners' underlying offenses. Petitioners allege in some cases DOC rejects CCC placement despite the fact the Board approved an individual's home plan.

F. Powers and Duties of the Board and DOC
Petitioners also allege the following with regard to the powers and duties of the Board and DOC. Contrary to its exclusive authority to parole and release on parole, and its duty to ensure parole and parole release are carried out in an efficient and timely manner, the Board allows Petitioners to languish in prison. The Board does so with knowledge that DOC, through its discriminatory policies, will not allow them to meet the terms of their parole. See Sections 6102(3), 6132(a)(1) and 6137(a) of the Parole Act, 61 Pa. C.S. §§ 6102, 6132(a)(1), 6137(a). The Board failed to meet its duty to ensure the efficient and timely release of those granted parole, directly and through its duty to contract for supplemental community services, by relying solely on its agreement with DOC to assist parolees with their transition into the community. See Section 6131(a)(8) of the Parole Act, 61 Pa.C.S. § 6131(a)(8).
The Board also failed to ensure the efficient and timely release of those granted parole by not meeting its duty to establish uniform statewide and evidence-based standards for home plan approval and making sure, through adequate administrative oversight, these standards are followed by its agents. See 61 Pa.C.S. §§ 6131(a)(5)(ii), (13), (14).
DOC failed to meet its duty as a Commonwealth agency to exercise only those powers given to it expressly or by necessary implication, or, with regard to the latter, to not exercise any power given exclusively to another agency. By agreeing to assist the Board in carrying out its responsibility to reintegrate paroled offenders into the community and to divert appropriate offenders from prison by way of CCC housing, DOC implicitly agreed not to interfere with the Board's exercise of its exclusive authority to parole and release on parole. DOC failed to meet its duty to act consistently with this agreement.
*538 By denying Petitioners the opportunity for community reintegration based on community opposition and by otherwise failing to serve a legitimate state objective in treating sex offenders differently than other paroled offenders, the Board and DOC violated Petitioners' rights to equal protection of the laws under the United States and Pennsylvania Constitutions.
Petitioners further aver their continued incarceration, which results from the failure of the Board and DOC to meet their statutory and constitutional duties, caused and continues to cause them irreparable harm. They have no adequate remedy at law to redress the violations of their rights.

G. Prayer for Relief
Based on these averments, Petitioners seek the following relief:
Wherefore, Petitioners request that this Court enter an order in mandamus which directs [DOC and the Board] to comply with their duties pursuant to Pennsylvania statutes and the provisions of the United States and Pennsylvania Constitutions guaranteeing equal protection of the laws, as follows:
1. enjoining DOC from interfering with the [Board's] exclusive authority to release on parole offenders who have been granted parole by discriminating against paroled sex offenders in the provision of transitional housing services;
2. enjoining DOC from continuing to contract with CCC providers which refuse to accept paroled sex offenders and instead, as necessary, procure providers which enable [DOC and the Board] to meet their statutory and constitutional duties;
3. enjoining [the Board] to supplement contracts for community services to assist parolees, as necessary to ensure the efficient and timely release of offenders who have been granted parole;
4. enjoining [the Board] to establish by regulation uniform and evidence-based standards for home plan approval;
5. enjoining [the Board] to provide notice of reasons for home plan denials and such administrative review as is necessary to ensure that the reasons comport with its established standards; and
6. providing such other and additional relief as is just and due under the circumstances.
Pet'rs' Pet. for Review, Prayer for Relief.

II. Preliminary Objections
The Board and DOC responded by filing preliminary objections. DOC objects the complaint is legally insufficient because Petitioners lack a clear right to the relief they seek against DOC. The Board objects: the complaint contains an improper caption because it names seven inmates, while the body of the complaint addresses claims by several additional inmates; the complaint does not include verifications for the additional inmates not named in the caption; and, the complaint is legally insufficient to state a claim against the Board.[4]
At the outset, we note, a demurrer contests the legal sufficiency of a complaint. Christ the King Manor v. Dep't of Pub. Welfare, 911 A.2d 624 (Pa.Cmwlth. 2006), aff'd 597 Pa. 217, 951 A.2d 255 (2008). In ruling on preliminary objections, we must accept as true all well-pled, *539 material facts and all inferences reasonably deducible from those facts. Id. However, we are not required to accept as true any unwarranted factual inferences, conclusions of law or expressions of opinion. Id. For this Court to sustain preliminary objections, it must appear with certainty that the law will not permit recovery. Id. Any doubt must be resolved in favor of the non-moving party. Id.

A. DOC's Preliminary Objections

1. Demurrer to Equal Protection Claim
DOC first argues Petitioners cannot state an equal protection claim. Specifically, DOC contends its CCC-placement procedures do not violate equal protection principles because sex offenders are not similarly situated to other offenders or parolees, and because DOC's procedures are rationally related to legitimate state interests.
Because the Board also objects to Petitioners' equal protection claim against it, we address the preliminary objections of the Board and DOC on this issue together. For its part, the Board asserts Petitioners did not aver sufficient facts to substantiate an equal protection claim. However, the Board argues, even if Petitioners did allege sufficient facts, the Board is not required to treat all inmates the same, and its decision not to release Petitioners should be upheld under the rational basis standard.
Equal protection under the law means that like persons in like circumstances will be treated similarly. Curtis v. Kline, 542 Pa. 249, 666 A.2d 265 (1995). "[A] classification must rest upon some ground of difference which justifies the classification and [must have] a fair and substantial relationship to the object of the legislation." Id. at 255, 666 A.2d at 268. A classification does not violate equal protection rights if a court determines there are reasons to sustain the classification. Id.
There are three different types of classifications: (1) those which implicate a suspect class or fundamental right; (2) those which implicate an important though not fundamental right or a sensitive classification; and (3) those which involve none of these. Id. If a classification implicates a suspect class or fundamental right, the statute is strictly construed in light of the compelling governmental purpose; if a classification implicates an important right, a heightened standard of scrutiny is applied to an important governmental purpose; and, if there is no fundamental or important right, the statute is upheld if there is any rational basis for the classification. Id.
In Jae v. Good, 946 A.2d 802, 808 n. 13 (Pa.Cmwlth.2008), this Court explained: "Neither prisoners nor indigents constitute a suspect class." See also Smolsky v. Pennsylvania General Assembly, 34 A.3d 316 (Pa.Cmwlth.2011); Kroh v. Unemployment Comp. Bd. of Review, 711 A.2d 1093 (Pa.Cmwlth.1998). Similarly, federal courts hold that prisoners do not constitute a suspect class. Abdul-Akbar v. McKelvie, 239 F.3d 307 (3d Cir.2001); Pryor v. Brennan, 914 F.2d 921 (7th Cir.1990).
Further, in Nieves v. Pennsylvania Board of Probation & Parole, 983 A.2d 236 (Pa.Cmwlth.2009), aff'd per curiam, ___ Pa. ___, 33 A.3d 1260 (2011), this Court, speaking through Senior Judge Friedman, held a sex offender inmate had neither a protected liberty interest nor due process rights in a CCC bed for parolees until he was actually released on parole. As such, the inmate could not challenge DOC's bed procedure on due process grounds. Here, Petitioners do not aver *540 they were released on parole; thus, they are in the same situation as the inmate in Nieves, and they have no due process right to a CCC bed.
For these reasons, there is no suspect class or important right at issue. Therefore, we must employ the rational basis analysis. To meet the rational basis test, a classification need only be directed at accomplishing a legitimate government interest in a manner that is not arbitrary or unreasonable. Commonwealth ex rel. Buehl v. Price, 705 A.2d 933 (Pa.Cmwlth. 1997).
Here, the Board asserts the Commonwealth's interest in providing paroled sex offenders with the proper post-incarceration treatment and surroundings is rationally related to rehabilitation and deterrence. Board's Prelim. Objections at ¶ 59. Further, DOC points to our unreported 2010 decision in Tyler v. Pennsylvania Board of Probation and Parole (Dkt. No. 449 M.D.2009, filed December 6, 2010) (McGinley, J.), in which we sustained preliminary objections and dismissed an inmate's claim that DOC violated his equal protection rights by treating sex offenders differently from other parole violators and non-sex offenders with regard to CCC placement. DOC's Prelim. Objections at ¶¶ 22-24. In so doing, we accepted DOC's argument that:
[T]here is a legitimate governmental interest to have inmates placed in CCC facilities appropriate for their needs and concomitant with the public right to safety, that no community should have to house large numbers of sex offenders at a particular time and that budget constraints limit the number of DOC owned CCCs that can be established to house sex offenders and violent offenders.
Id. at ¶ 24 (citing Tyler, Slip Op. at 9).
Also, pursuant to Section 6102(1) of the Parole Act, which sets forth the Commonwealth's public policy concerning parole, "the [B]oard and any other paroling entity shall first and foremost seek to protect the safety of the public." 61 Pa.C.S. § 6102(1) (emphasis added). According to the Board and DOC, Petitioners' classification bears a rational relationship to this legitimate interest. In light of the above authority, we agree with the Board and DOC. Therefore, we sustain their preliminary objections to Petitioners' equal protection claims. See, e.g., Stewart v. Pa. Board of Prob. & Parole, 714 A.2d 502 (Pa.Cmwlth. 1998) (sustaining Board's demurrer to inmate's equal protection claim based on Board's policy regarding denial of parole to violent offenders at the expiration of their minimum sentences; rational basis existed based on Parole Act's primary purpose of protecting public safety).[5]
*541 Additional support for this conclusion is found in the U.S. District Court for the Eastern District of Pennsylvania's decision in Dantzler v. Tennis, Civil Action No. 08-1612, 2008 WL 4274486, at *2 (E.D.Pa., Sept. 17, 2008). There, an inmate, who was a sex offender, raised an equal protection challenge to the Board's failure to locate a suitable CCC placement for him after the grant of parole. In granting a motion to dismiss for failure to state a claim, the district court explained:
The Equal Protection Clause, to the extent it serves as [the inmate's] basis for relief, affords no heightened scrutiny of a state's treatment of sex offenders. See, Cutshall v. Sundquist, 193 F.3d 466, 482 (6th Cir.1999). The Supreme Court has named the personal characteristics receiving heightened equal protection scrutiny: race, alienage and national origin, gender and status as a non-marital child. Cleburne v. Cleburne Living Center, 473 U.S. 432, 439-40, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Different punishments or parole schemes based only on the nature of a crime do not fall within the classifications listed in Cleburne. Another decision of the Supreme Court specifically refused to apply heightened scrutiny to a classification based on the nature of the petitioner's crime. Chapman v. United States, 500 U.S. 453, 465, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991). Citing Cleburne and Chapman, the Third Circuit has refused to find that a distinction drawn between "compulsive and repetitive" sex offenders and other sex offenders receives heightened scrutiny. Artway v. Attorney General of New Jersey, 81 F.3d 1235, 1267 (3d Cir.1996).
The Equal Protection Clause requires only that the state provide some plausible reason-a "rational basis"-for treating convicted sex offenders differently from other prisoners or parolees. Pennsylvania's interests in providing communities notice about the release of convicted sex offenders and in providing paroled sex offenders with post-incarceration treatment meet the rational basis standard of review.
Id. Ultimately, the Court in Dantzler dismissed the inmate's complaint for failure to state a claim. For all the reasons stated above, the same result is warranted here.

2. DOC's Demurrer to Claim of Interference with Board's Statutory Duties
DOC next takes issue with Petitioners' claim that, by refusing to issue CCC bed dates for Petitioners, DOC is usurping the Board's exclusive power to parole. DOC asserts Petitioners seek to enjoin it from refusing to accept sex offenders into DOC's CCCs where the Board's parole *542 action indicates an offender should go to a CCC. Contrary to Petitioners' claims, DOC contends, the Board has no authority to order placement of a parolee into a DOC-owned or contracted CCC. Thus, according to DOC, its CCC placement procedures do not usurp the Board's paroling authority because the Board has no authority to mandate that a parolee be placed in a DOC-run CCC.
Whether a petitioner seeks a writ of mandamus or an injunction, his threshold burden is to establish a clear legal right to relief. Unified Sportsmen of Pa. v. Pa. Game Comm'n (PGC), 950 A.2d 1120 (Pa.Cmwlth.2008). Here, Petitioners lack a clear right to relief.
Specifically, based on our review of the relevant statutory provisions, we reject Petitioners' claim that DOC is interfering with the Board's power to parole. With regard to the Board's specific powers relating to parolees, Section 6132(a) of the Parole Act provides:
(a) General rule.The board shall have exclusive power:
(1)(i) To parole and reparole, commit and recommit for violations of parole and to discharge from parole all persons sentenced by any court at any time to imprisonment in a correctional institution
(ii) This paragraph applies to inmates sentenced to definite or flat sentences
(2)(i) To supervise any person placed on parole, when sentenced to a maximum period of less than two years, by any judge of a court having criminal jurisdiction, when the court may by special order direct supervision by the board, in which case the parole case shall be known as a special case and the authority of the board with regard thereto shall be the same as provided in this chapter with regard to parole cases within one of the classifications set forth in this chapter.
(ii) Except for such special cases, the powers and duties conferred by this section shall not extend to persons sentenced for a maximum period of less than two years and shall not extend to those persons committed to county confinement within the jurisdiction of the court pursuant to 42 Pa.C.S. § 9762(b)(2) (relating to sentencing proceeding; place of confinement).
61 Pa.C.S. § 6132(a).
Further, Section 6137(a)(1) of the Parole Act states:
(a) General criteria for parole.
(1) The board may parole subject to consideration of guidelines established under 42 Pa.C.S. § 2154.5 (relating to adoption of guidelines for parole) and may release on parole any inmate to whom the power to parole is granted to the board by this chapter, except an inmate condemned to death or serving life imprisonment, whenever in its opinion:
(i) The best interests of the inmate justify or require that the inmate be paroled.
(ii) It does not appear that the interests of the Commonwealth will be injured by the inmate's parole.
61 Pa.C.S. § 6137(a)(1); see also 61 Pa. C.S. § 6131 (relating to Board's general powers). In short, the Board's function is the administration of probation and parole in Pennsylvania. 61 Pa.C.S. § 6111(a). The provisions that outline the Board's powers and duties contain no reference to any authority to place parolees into CCCs upon the grant of parole. Further, these provisions do not authorize the Board to require DOC to accept parolees into its CCCs upon the grant of parole.
*543 Rather, as set forth by statute, a "[c]ommunity corrections center" is a "residential program that is supervised and operated by [DOC] for inmates with prerelease status or who are on parole." 61 Pa.C.S. § 4103 (emphasis added); see also 37 Pa. Code § 91.1. In short, although the Board is empowered to grant parole, its authority does not extend to the operation of CCCs, which are within DOC's authority.
By way of analogy, in the pre-release setting, in Turner v. Pennsylvania Board of Probation and Parole, 749 A.2d 1018, 1020 (Pa.Cmwlth.2000), this Court sustained preliminary objections to an inmate's suit that sought an order requiring the Board to place him in a pre-release center. In so doing, this Court explained (with emphasis added):
The General Assembly provided for the establishment of pre-release centers and rules and regulations regarding the same in Sections 1 through 4 of the Act of July 16, 1968, P.L. 351, as amended, 61 P.S. § 1051-1054 [(now codified at 61 Pa.C.S. §§ 3701-3704) ]. However, the General Assembly specifically provided the DOC, not the Board, with the authority to determine which inmates would be transferred to the pre-release centers. See Section 3 of the Act of July 16, 1968, 61 P.S. § 1053. Hence, the Board has no authority or duty to perform the act requested by Petitioner in the instant case, i.e., place him in a pre-release center.

Id. Based on the above authority, we discern no basis upon which to conclude Petitioners can state a viable claim against DOC based on its alleged interference with the Board's statutory duties.
Moreover, we reject Petitioners' claim that our Supreme Court's recent decision in Fross v. County of Allegheny,___ Pa. ___, 20 A.3d 1193 (2011) is controlling here. In Fross, our Supreme Court considered whether an Allegheny County ordinance, which imposed stringent residency restrictions on sex offenders in the County, was preempted by the Parole Act and Megan's Law. Ultimately, the Supreme Court held the County's ordinance interfered with both statewide statutory schemes, and, therefore, was preempted under the doctrine of conflict preemption.
Unlike Fross, Petitioners' claims regarding DOC's alleged interference with the Board's powers and duties to grant parole does not involve an issue of preemption. Further, based on the authority discussed above, we discern no conflict between the duties of the Board and those of DOC. As such, we reject Petitioners' reliance on Fross.
Finally, although Petitioners seek an order enjoining DOC from continuing to contract with CCC providers that refuse to accept paroled sex offenders, Petitioners lack a clear right to such relief. Petitioners cannot state a claim for mandamus or injunctive relief that would permit interference with DOC's discretionary right to contract with particular vendors who operate CCCs. See, e.g., Nickson v. Pa. Bd. of Prob. & Parole, 880 A.2d 21 (Pa.Cmwlth. 2005) (in an action for mandamus involving an agency's exercise of discretion, we may not direct the agency to exercise its judgment or discretion in a particular way, or direct the retraction or reversal of action already taken).
Having sustained DOC's preliminary objections to Petitioners' claims against it, we dismiss DOC as a party here.

B. The Board's Preliminary Objections

1. Improper Caption
The Board first asserts Pennsylvania Rule of Civil Procedure 1018 requires all parties to an action be named in the caption *544 of the pleading. It asserts that here the body of the petition for review seeks relief on behalf of several additional inmates not named in the caption. Thus, the Board asks that we dismiss the petition for review as to those individuals named in the body of the complaint, but not in the caption.
Petitioners respond that the petition for review includes the names of individuals who are not proceeding as Petitioners, "but who are intended as exemplars of [the Board and DOC's] administration of parole release for individuals convicted of sex offenses or who are regarded as sex offenders." Pet'rs' Consolidated Br. in Opp'n to Resp'ts' Prelim. Objections and in Support of Mot. for Summary Relief at 44 (emphasis added).
Pa. R.C.P. No. 1018 states: "Every pleading shall contain a caption setting forth the name of the court, the number of the action and the name of the pleading. The caption of a complaint shall set forth the form of the action and the names of all the parties...." Id. (emphasis added). Because the individuals referenced in the body of the complaint, but not the caption, are merely intended as examples, and not parties seeking relief, we overrule the Board's preliminary objection based on an improper caption.

2. Lack of Verifications
The Board also objects the complaint does not contain verifications for the individuals named in the body of the complaint, but not the caption. The Board argues that, if these individuals are admitted as parties here, the complaint should be dismissed as to these individuals, or they should be ordered to file verifications as required by Pa. R.C.P. No. 1024.
Petitioners again respond that the facts alleged in the body of the complaint that relate to individuals not named in the caption are intended as additional examples and these individuals are not intended to be petitioners. They maintain all named parties filed verifications. As such, they are in compliance with Pa. R.C.P. No. 1024.
As with the Board's preliminary objection to the caption of the complaint, the individuals referenced in the body of the complaint but not the caption were merely intended as examples and were not intended to be included as parties here. As such, these parties were not required to file verifications. See Pa. R.C.P. No. 1024(a), (c) (requiring that verification be made by one or more of the parties filing a pleading). Thus, we overrule the Board's preliminary objection that those additional individuals referenced in the body of the complaint, but not intended to be named as parties, were required to file verifications.

3. The Board's Demurrer to Petitioners' Claims that the Board Violated its Statutory Duties

a. Duty to Act in an "Efficient and Timely" Manner
The Board points out that Petitioners seek a writ of mandamus based on the premise that they are entitled to "efficient and timely" release on parole. However, the Board argues, under Pennsylvania law, an inmate does not have a liberty interest in parole until he attains parolee status, and an inmate does not acquire a liberty interest until parole is executed, i.e., he is granted parole and is actually released from custody. See Rogers v. Pa. Bd. of Prob. & Parole, 555 Pa. 285, 292, 724 A.2d 319, 323 (1999) ("[U]nder both this Court's precedent and the precedent of the United States Supreme Court, the ... Board's decision to grant or deny parole does not affect an existing enjoyment of liberty."); Johnson v. Pa. Bd. of Prob. & Parole, 110 *545 Pa.Cmwlth. 142, 532 A.2d 50 (1987) (grant of parole is not executed until a prisoner signs an acknowledgement of parole conditions, and the Board issues its parole release order). Here, the Board contends, Petitioners do not aver they obtained parolee status; thus, they do not have a liberty interest that may be asserted through a suit in mandamus. See Nieves.
Petitioners respond that the Board has a mandatory duty to administer parole release in an "efficient and timely" manner and to consider all inmates for parole (except those sentenced to life or condemned to death). See 61 Pa.C.S. §§ 6102(3), 6131, 6137(a)(1), 6139. Petitioners assert that by paroling them and failing to release them, the Board is not complying with its statutory duty to administer parole release in an "efficient and timely" manner, and, as such, mandamus is proper to require the Board to adhere to its statutory duty. 61 Pa.C.S. § 6102(3). Petitioners also point to the fact that the cost of their continued incarceration significantly exceeds the cost of parole supervision. Petitioners contend the legislature did not confer upon the Board a duty to simply consider individuals for parole, to find them suitable for release, and to never release them.
As noted above, mandamus is a proper remedy only where the plaintiff shows he has a clear legal right to the performance of a purely ministerial non-discretionary act, the defendant has a corresponding mandatory duty to perform the act, and there is no other appropriate or adequate remedy. Gordon v. Dep't of Corr., 16 A.3d 1173 (Pa.Cmwlth.2010).
The purpose of mandamus is not to establish legal rights but to enforce those rights already existing beyond peradventure. Loomis v. Pa. Bd. of Prob. & Parole, 878 A.2d 963 (Pa.Cmwlth.2005); Aviles v. Dep't of Corr., 875 A.2d 1209 (Pa.Cmwlth.2005). In an action for mandamus involving an agency's exercise of discretion, we may direct the agency to perform the discretionary act; however, we may not direct the agency to exercise its judgment or discretion in a particular way, or direct the retraction or reversal of action already taken. Nickson.
Here, Petitioners' mandamus claim is based upon a phrase within a subsection of the Parole Act that generally describes the Parole Act's purpose. See 61 Pa.C.S. § 6102 (entitled, "Operation of parole system generally"). When placed in proper context, however, it is clear the Board's duty to act in an "efficient and timely manner," is not the paramount objective of the parole system. To that end, Section 6102 of the Parole Act provides, in its entirety:
§ 6102. Operation of parole system generally
The parole system shall operate consistently with the following provisions:
(1) The parole system provides several benefits to the criminal justice system, including the provision of adequate supervision of the offender while protecting the public, the opportunity for the offender to become a useful member of society and the diversion of appropriate offenders from prison.
(2) In providing these benefits to the criminal justice system, the board and any other paroling entity shall first and foremost seek to protect the safety of the public.

(3) In addition to this goal, the board and any other paroling entity shall address input by crime victims, assist in the fair administration of justice by ensuring the custody, control and treatment of paroled offenders, shall consider any applicable guidelines established by the commission and shall ensure that *546 parole proceedings, release and recommitment are administered in an efficient and timely manner.
61 Pa.C.S. § 6102 (emphasis added). Thus, the Board's overriding legislative duty is to protect the safety of the public. This paramount legislative directive "clearly envisions that restrictions can legitimately be placed on a parolee, similar to the restrictions legitimately placed on incarcerated persons." Wheeler v. Pa. Bd. of Prob. & Parole, 862 A.2d 127, 130 (Pa. Cmwlth.2004).
The legislature's inclusion of language relating to public safety as the Board's paramount concern in the 1996 amendments to the Parole Act was discussed in several opinions, including the Third Circuit's decision in Mickens-Thomas v. Vaughn, 321 F.3d 374, 385-86 (3d Cir. 2003), in which the Court explained:
The record is convincing that after 1996, the Board applied to the public safety interest far greater weight. The evidence here demonstrates that since 1996, the Board has given special weight to the risk to public safety. Pre-1996, a prisoner could be denied parole because of public safety concerns only if those concerns together with other relevant factors outweighed, by a preponderance, the liberty interests of the inmate. The 1996 policy change placed first and foremost the public safety to the disadvantage of the remaining liberty interest of the prisoner....
We conclude, then, that prior to 1996, the Board's concern for potential risks to public safety could not be the sole or dominant basis for parole denial under the existing [g]uidelines. Considerations of public safety were already incorporated into its [g]uidelines analysis; the Board had to point to "unique" factors as a basis for its rejection of the [g]uidelines. Moreover, the Board had to weigh all factors, militating for and against parole, and make its decision on the totality of the factors pertinent to parole, and give appropriate weight to the interests of the inmate. Heavy foot application on one factor could not have been the basis of granting or rejecting parole. Policy declarations in and after 1996 demonstrate that Board stance shifted and that, indeed, post-1996 considerations of public safety became the dominant concern of the Board.

Here, all of the Petitioners were granted parole well after the 1996 amendment to the Parole Act, which requires the Board to protect public safety as its foremost consideration. Thus, while Petitioners focus on the Board's duty to "ensure that parole proceedings, release and recommitment are administered in an efficient and timely manner[,]" 61 Pa.C.S. § 6102(3), the Board's duty to protect the public is paramount. 61 Pa.C.S. § 6102(2). Further, Petitioners' claim ignores the fact that the Board possesses "legal authority to postpone a parole date until a satisfactory plan is arranged for the parolee and approved by the Board." Nieves, 983 A.2d at 240 (citing 37 Pa.Code § 63.1). For these reasons, Petitioners cannot establish the clear right to relief needed to state a claim for mandamus based upon the phrase they excerpt from a subsection of the Parole Act's purpose.[6]

*547 b. Board's Duty to Contract for "Supplemental Services"
As an alternative to their claim that DOC has a mandatory duty to abide by the Board's decisions and place individuals in CCCs, Petitioners claim the Board is violating its duty to contract for supplemental existing services. Specifically, they contend under the title, "General powers of the board," the following general rule is stated: "(a) The board shall have the power and its duty shall be: ... (8) [t]o enter into contracts for purchasing community services to assist parolees and to supplement existing programs." 61 Pa.C.S. § 6131(a)(8). Petitioners maintain the Board is not complying with this statutory duty.
Specifically, Petitioners allege "there is an insufficient number of CCC placements made available for paroled inmates whose release from prison is dependent on initial CCC occupancy." Pet. for Review at ¶ 28. Petitioners also aver the "[Board] is aware that there are virtually no CCC placements available for the hundreds of sex offenders who have been granted parole due to the policies of the DOC and privately operated CCCs yet it has not contracted to supplement halfway house services in order to assist these parolees." Pet. for Review at ¶ 43 (emphasis added). In sum, Petitioners contend the Board did not comply with its duty to enter into contracts for community services to assist parolees because it has not entered into contracts for additional CCCs to house sex offenders. Thus, we should overrule the Board's preliminary objection to this claim.
Contrary to Petitioners' claims, the statutory language they cite does not require the Board to enter into contracts for additional CCCs beyond those facilities owned by or under contract with DOC. The statutory provision relied on by Petitioners imposes a duty on the Board to enter into contracts for "purchasing community services[.]"[7] 61 Pa.C.S. § 6131(a)(8) (emphasis added). In addition, the provision imposes a duty on the Board to "supplement existing programs." Id. (emphasis added). Petitioners point to no authority that the language employed in this provision could be construed to require the Board to enter into contracts for additional CCC facilities beyond those owned or contracted with by DOC. As such, Petitioners lack a clear right to mandamus relief based on Section 6131(a)(8) of the Parole Act.

4. Board's Demurrer to Claims Regarding Denial of "Home Plans"
The Board also objects to Petitioners' claims that the Board improperly denied *548 Petitioners' home plans by failing to provide written reasons for denial of those plans. The Board asserts it has regulatory authority to delay parole release until a satisfactory plan is arranged and approved. 37 Pa.Code § 63.1(d) ("The date of parole may be postponed until a satisfactory plan is arranged for the parolee and approved by the Board.") It further argues there is no authority requiring it to approve home plans for Petitioners beyond the CCC residency placements the Board sets. Moreover, there is no legal authority requiring the Board to approve home plans that are near schools, children's dwellings or children's play areas.
Petitioners counter the facts pled in their complaint reveal the Board does not provide written reasons for its denial of home plans making it difficult, if not impossible, for Petitioners to identify the purported deficiencies that lead to denial of those plans. Thus, Petitioners seek mandamus to compel the Board to provide written reasons for its home plan denials in accordance with its statutory duties.
This Court accepted a claim analogous to that raised by Petitioners in Boyd v. Ward, 802 A.2d 705 (Pa.Cmwlth.2002). There, we considered whether the Board complied with its statutory mandates when issuing a decision to deny an inmate parole. This Court stated that former Section 22 of the Parole Act,[8] required the Board to provide a brief statement of its reasons for granting or denying parole. Applying that Section, we held the Board's statement that "the fair administration of justice cannot be achieved through the [inmate's] release on parole," was insufficient to satisfy the Board's statutory mandate. Boyd, 802 A.2d at 708. Thus, we overruled the Board's preliminary objections to the inmate's mandamus action seeking to compel the Board to provide a written reason for its decision to deny parole.
Similar to the inmate in Boyd, Petitioners here claim that, although the Board granted them parole, it effectively denied their release on parole by denying their home plans without specifying any basis for doing so. As a result, Petitioners claim they are unable to discern the basis for the Board's denial of their home plans, which, may, in fact, be arbitrary. Because the Board's denial of Petitioners' home plans effectively results in a failure to release on parole, we agree with Petitioners that, at this stage, they state a claim that the Board should provide a brief, written explanation for its denial of their home plans so as to ensure the decision is not arbitrary. As such, we overrule the Board's preliminary objection to Petitioners' claims regarding the Board's failure to provide grounds for its denial of home plans.
Petitioners also claim the Board failed to abide by its mandatory duty to use uniform and "evidence-based" standards in reaching parole decisions. Petitioners assert the Board's current practices are arbitrary rather than evidence-based as required by Section 6131(a)(15) of the Parole Act. Petitioners further maintain, despite the existence of some uniform standards, these standards are not always followed. Based on the facts averred in the complaint, Petitioners assert the Board does not apply uniform, "evidence-based" standards in its review of home plans, which contravenes the Board's mandatory statutory duties. See 61 Pa. C.S. § 6131(a)(13), (14) (requiring Board to incorporate evidence-based practices into parole *549 decision making and supervision and to coordinate reentry of offenders into the community using evidence-based practices that effectively reduce recidivism).
Section 6131(a)(15) of the Parole Act states the Board shall have the power and its duty shall be "[t]o conduct research to identify, to be informed of and to apply recognized evidence-based parole practices that promote public safety and reduce recidivism." 61 Pa.C.S. § 6131(a)(15). While Petitioners contend the Board's evaluation of home plan applications should be based upon "evidence-based" standards, Petitioners' claim overlooks the fact that the term "evidence-based practices," used in Section 6131(a)(15) is a specifically defined term in the statute.
More particularly, Section 6131(d) defines "evidence-based practices" as "Interventions and treatment approaches that have been proven effective through appropriate empirical analysis." 61 Pa.C.S. § 6131(d) (emphasis added). Thus, although Petitioners claim the Board must use evidence-based "standards" in rendering decisions on home plan applications, the statute actually speaks to "evidence-based practices," a defined term, which requires the Board to analyze appropriate interventions and treatment approaches. As such, the statutory language relied on by Petitioners simply does not support their claim and, therefore, Petitioners lack a clear right to relief on this claim.
As a final point regarding the Board's denial of home plans, Petitioners assert that in certain instances the Board denies home plans for individuals who seek to reside in Allegheny County based on the County's ordinance that imposes residency restrictions on sex offenders. In so doing, Petitioners argue, the Board neglects our Supreme Court's decision in Fross, which struck down Allegheny County's sex offender residency ordinance.
Despite Petitioners' assertions, our review of their petition for review reveals Petitioners do not aver that any of the named Petitioners were denied CCC placement based on application of the now invalid Allegheny County ordinance imposing residency restrictions on sex offenders. See Fross. As a result, Petitioners do not state a claim for relief on this basis.

III. Petitioners' Motion for Summary Relief
After the Board and DOC filed their preliminary objections, Petitioners filed a motion for summary relief. Through their motion, Petitioners assert no factual issues exist, and they are entitled to judgment as a matter of law on their claims against the Board and DOC. In particular, Petitioners maintain they are entitled to declarations that DOC interfered with the Board's exclusive power to grant parole, and that DOC violated their right to equal protection by treating them differently from other non-sex offenders.
As to the Board, Petitioners contend they are entitled to summary relief because it is clear the Board failed to adhere to its statutory duties. Specifically, Petitioners maintain they are now entitled to an order directing the Board to: (1) delete language from its policy applicable to reentry supervision of sex offenders, which states "[t]he approved residence must be in compliance with any locally enacted sex offender restriction ordinances (no exceptions)" and any other similar language in its policies, procedures, and guidelines; (2) instruct its parole agents to cease deferring to local ordinances; (3) develop and apply uniform, evidence-based standards for consideration of home plans; (4) eliminate language in its policies, procedures, and guidelines that impose non-evidence based standards on sex-offenders; (5) provide Petitioners who submitted home plan *550 applications with written decisions granting or denying such applications, stating the reasons for denial; (6) exercise its exclusive authority to parole, and, if granted, ensure timely release on parole; and, (7) make CCC placements or other community-based transitional housing available to paroled sex offenders when such housing is determined to be a condition of parole release or when necessary to meet its express duty to supplement existing services to assist parolees.
An application for summary relief filed pursuant to Pa. R.A.P. 1532(b) is generally the same as a motion for peremptory judgment filed in a mandamus action in the common pleas court. See Official Note to Pa. R.A.P. 1532(b). Summary relief may be granted where the right to such relief is clear. Pa. R.A.P. 1532(b). Thus, where there are material issues of fact in dispute, or if it is not clear the applicant is entitled to judgment as a matter of law, the application will be denied. Marshall v. Pa. Bd. of Prob. & Parole, 162 Pa.Cmwlth. 256, 638 A.2d 451 (1994).
Here, based on our decision to sustain the majority of the preliminary objections filed by the Board and DOC, we deny Petitioners' application for summary relief on Petitioners' claims that DOC interfered with the Board's exclusive power to grant parole, and that DOC violated Petitioners' right to equal protection by treating them differently from other non-sex offenders.
Additionally, we deny summary relief on Petitioners' claims seeking an order requiring the Board to: delete language from its policy applicable to reentry supervision of sex offenders, which states "[t]he approved residence must be in compliance with any locally enacted sex offender restriction ordinances (no exceptions)" and any other similar language in its policies, procedures, and guidelines; instruct its parole agents to cease deferring to local ordinances; develop and apply uniform, "evidence-based" standards for consideration of home plans; eliminate language in its policies, procedures, and guidelines that impose "non-evidence-based" standards on sex-offenders; exercise its exclusive authority to parole, and, if granted, ensure timely release on parole; and, make CCC placements or other community-based transitional housing available to paroled sex offenders when such housing is determined to be a condition of parole release and/or when necessary to meet its express duty to supplement existing services to assist parolees.
As for Petitioners' claim seeking an order requiring the Board to provide Petitioners who submitted home plan applications with decisions that contain written reasons for the denial of such applications, despite our determination that Petitioners successfully pled such a claim, we decline to grant summary relief at this stage. We believe it more prudent to allow the Board to plead to the claim.
Based on the foregoing, we sustain DOC's preliminary objections to all of Petitioners claims against it and, therefore, we dismiss the petition for review with regard to DOC. Additionally, we sustain in part, and overrule in part, the Board's preliminary objections. Finally, we deny Petitioners' motion for summary relief.

ORDER
AND NOW, this 2nd day of February, 2012, the preliminary objections of Respondents the Pennsylvania Board of Probation and Parole and Catherine C. McVey, Chairman are SUSTAINED in part, and OVERRULED in part, consistent with the foregoing opinion. Respondents the Pennsylvania Board of Probation and Parole and Catherine C. McVey, *551 Chairman shall file an answer within the time allowed by Pa. R.A.P. 1516(b).
The preliminary objections of the Pennsylvania Department of Corrections and John E. Wetzel, Secretary, are SUSTAINED. The petition for review filed by Petitioners is DISMISSED with respect to the Pennsylvania Department of Corrections and John E. Wetzel, Secretary, only.
Petitioners' motion for summary relief is DENIED.
NOTES
[1] Petitioners named in the caption of the complaint are Samuel Barge, Timothy Helsel, Peter Rackley, Joseph Hartdegen, Juan Lopez, Clyde Phillips and Gregory Moore. As discussed more fully below, Petitioners' complaint also addresses claims by several additional inmates, who are not named in the caption, and who, according to Petitioners, were not intended to be included as parties to this suit, but rather were merely included as exemplars.
[2] Mandamus is the proper remedy only where the plaintiff demonstrates he has a clear legal right to the performance of a purely ministerial non-discretionary act, the defendant has a corresponding mandatory duty to perform the act, and there is no other appropriate or adequate remedy. Gordon v. Dep't of Corr., 16 A.3d 1173 (Pa.Cmwlth.2010). Further, in order to obtain an injunction, a party must establish that his right to relief is clear, that an injunction is necessary to avoid an injury that cannot be compensated by damages, and that greater injury will result from refusing rather than granting the relief requested. Id. We may not grant such relief where an adequate remedy at law exists. Id.
[3] Megan's Law attempts to protect the safety and welfare of people in the Commonwealth by providing for the registration and notification of sexually violent predators and certain other offenders who are about to be released from custody. Safety of the public, according to the legislature is of "paramount concern." 42 Pa.C.S. § 9791(a)(3). Section 9791 was amended by the Act of December 20, 2011, P.L. 111. That amendment did not alter the legislature's view that public safety remains the paramount concern. Id.
[4] The Board also initially objected that Petitioners did not properly serve the complaint; however, it subsequently withdrew the objection.
[5] Further, although Petitioners maintain DOC discriminates against sex offenders based on community opposition, the fact that a clearly discernible rational basis exists, belies this assertion. See, e.g., Corteal v. Dep't of Transp., 821 A.2d 173, 177 (Pa.Cmwlth.2003) (citing Fed. Commc'ns Comm'n v. Beach Commc'ns, Inc., 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)) (under rational basis analysis "the burden is upon the challenging party to negate any reasonably conceivable state of facts that could provide a rational basis for the classification.")

To that end, Petitioners' reliance on City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), is misplaced. In Cleburne, our Supreme Court considered whether a zoning ordinance, which required a special use permit for homes for the mentally retarded but not for other types of group homes and multiple-dwelling facilities, violated the equal protection clause. The Supreme Court held, because the record before it did not reveal any rational basis for believing that a home for the mentally retarded would pose any threat to the city's legitimate interests, the zoning ordinance was invalid as applied. The Supreme Court declared "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases for treating a home for the mentally retarded differently from apartment houses, multiple dwellings, and the like." Id. at 448, 105 S.Ct. 3249. The Court further explained, "The short of it is that requiring the permit in this case appears to us to rest on an irrational prejudice against the mentally retarded, including those who would occupy the [proposed] facility and who would live under the closely supervised and highly regulated conditions expressly provided for by state and federal law." Id. at 450, 105 S.Ct. 3249.
Unlike in Cleburne, here a clear rational basis exists for treating convicted sex offenders differently from other prisoners or parolees. As explained in greater detail above, the legitimate governmental interest of having inmates placed in CCC facilities appropriate for their needs, together with the public's right to safety, provide a rational basis. Thus, Cleburne does not compel the result Petitioners seek.
[6] Moreover, Petitioners' reliance on Morganelli v. Casey, 163 Pa.Cmwlth. 538, 641 A.2d 674 (1994), for the proposition that mandamus is available even when the specific time frame for action is not set forth by statute, is misplaced. In Morganelli, we considered whether mandamus could lie to compel the Governor to issue death warrants within a reasonable time of receiving the record in a capital case from the Supreme Court, despite the fact the relevant statutory provision did not impose a specific time frame. Ultimately, we held, although the statutory provision did not reference a specific time frame for the Governor to act, it did require the Governor to issue a death warrant, "commanding that [the] inmate be executed within the week to be named in said warrant ...." Morganelli, 641 A.2d at 675 (quoting the Act of June 19, 1913, P.L. 528, § 3, as amended, formerly 61 Pa.C.S. § 6123, Death Penalty Procedures Act) (emphasis added). We held this language relating to timing required the Governor to act within a reasonable time, and, therefore mandamus could lie to require the Governor to do so.

Unlike the specific statutory provision at issue in Morganelli, the statutory language emphasized by Petitioners here is found in the last line of the purpose section of the Parole Act, and it does not contain a reference to any clear time frame anywhere in the provision. The general language in the Parole Act's purpose section is not comparable to the specific statutory section at issue in Morganelli. As such, Petitioners' reliance on Morganelli fails.
[7] The term "service" is generally defined as "[t]he act of doing something useful for a person or company for a fee ..." or "[a]n intangible commodity in the form of human effort, such as labor, skill or advice...." BLACK'S LAW DICTIONARY 1399 (8th ed.2004).
[8] Act of August 6, 1941, P.L. 861, as amended, formerly 61 P.S. § 331.22. A similar provision is now codified at 61 Pa.C.S. § 6139(a)(5).